641 A.2d 719

**Robert M. CURLEY**

v.

**BOARD OF SCHOOL DIRECTORS OF the GREATER JOHNSTOWN SCHOOL DISTRICT, Appellant.**

Commonwealth Court of Pennsylvania.

Argued March 1, 1994.

Decided May 4, 1994.

650

Matthew M. Hoffman, for appellant.

William K. Eckel, for appellee.

Before McGINLEY and NEWMAN, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

The Board of School Directors of the Greater Johnstown School District (Board), appeals from the order of the Court of Common Pleas of Cambria County granting Appellee, Robert M. Curley (Curley), additional compensation in the amount of Three Thousand Six Hundred Seventy-four Dollars and Five Cents ($3,674.05), and decreeing that he was to be compensated under the 1989 Administrative Compensation Plan (ACP). We affirm the trial court.

■ The basic facts are not in dispute. Curley began his employment in the Greater Johnstown School District in 1958 and over the years held a variety of professional positions. In May of 1971, the Pennsylvania Labor Relations Board (PLRB) certified the Greater Johnstown Educational Association (Association) as the exclusive representative for the bargaining unit which included teachers and other professional employees, including assistant psychologists. Psychologists, who were considered first-level supervisors within the meaning of Sections 301(6) and 604(5) of *Act 195* of the Public Employe Relations Act (PERA/Act 195), Act of July 23, 1970, P.L. 563,

*as amended,* 43 P.S. §§ 1101.301(6), 1101.604(5), were excluded from the bargaining unit. Beginning in the 1985–86 school year until his retirement in June, 1992, Appellee was employed as a school psychologist. The date is not clear from the record, but some time before 1991 the position of assistant psychologist was eliminated, but despite this change, Curley and the other school psychologists were never made part of the bargaining unit certified by the PLRB in 1971. Under *Act 195,* first-level supervisors were and are permitted to form their own separate, homogenous, bargaining units, but these supervisory units do not have the right to engage in collective bargaining and are statutorily prohibited from striking. They do have the right, however, to "meet and discuss" with their employers. 43 P.S. § 1101.604(5). It is not known from the record whether school psychologists in Johnstown were ever part of such a supervisory unit.

In 1984 the Public School Code of 1949 was amended by *Act 93* to provide for a written Administrator Compensation Plan (ACP) for school administrators, including first-level supervisors not included in a bargaining unit of employees Under Act 195. Section 11–1164 of the Public School Code of 1949 (School Code).[1] Section 11–1164 provides:

§ **11–1164. Compensation plans for school administrators**

(a) As used in this section, the following words will have the following meanings:

'**Administrative compensation**' shall mean administrator salaries and fringe benefits and shall include any board decision that directly affects administrator compensation such as administrative evaluation and early retirement programs.

'**School administrator**' shall mean any employe of the school entity below the rank of district superintendent, executive director, director of vocational-technical school, assistant district superintendent or assistant executive director, *but including the rank of first level supervisor, who*

---

**1.** Act of March 10, 1949, P.L. 30, *as amended,* added by Act of June 29, 1984, P.L. 438, No. 93, § 4, 24 P.S. § 11–1164.

*by virtue of assigned duties is not in a bargaining unit of public employes as created under the act of July 23, 1970 (P.L. 563, No. 195) known as the 'Public Employe Relations Act.'* However, this definition shall not apply to anyone who has the duties and responsibilities of the position of business manager or personnel director, but not to include principals. **'School employer'** shall mean a board of school directors, the area vocational-technical school board of directors or the intermediate unit board of school directors as defined in this act.

(b) The purpose of this section is to provide a means by which compensation matters affecting school administrators can be resolved within the framework of a management team philosophy.

(c) School employers, upon the written request of a majority of the school administrators in the district, *shall be required to meet and discuss in good faith with the school administrators on administrator compensation prior to adoption of the compensation plan.*

(d) School employers shall be required to adopt written administrator compensation plans which shall apply to all eligible school administrators, as provided in this section, *and which shall continue in effect until a time specified in the compensation plan,* but in no event for less than one school year.

(e) An administrator compensation plan adopted pursuant to this section shall include, but not be limited to, the following items:

(1) A description of the program determining administrative salaries.

(2) Salary amounts or a salary schedule.

(3) A listing of fringe benefits.

(f) School employers and school administrators shall continue to be subject to the Act of June 30, 1947 (P.L. 1183, No. 492), referred to as the Public Employe Anti–Strike Law.

(emphasis added).

In September of 1988, following meetings and discussions with the District's school administrators, the Board adopted a

six page written ACP for the period of July 1, 1989 through June 30, 1993, providing for salaries and benefits for seventeen (17) administrative positions in the District, including psychologists.[2] Curley was compensated under this plan for two years until August 1, 1991, when, following a "meet and discuss" session with two administrators (not including either psychologist), the Board adopted another written ACP for the school years 1991–1993. This six page document, like its predecessor ACP, specifies salaries, length of work year, benefits, etc., and it defines administrator to exclude eight previously included administrative positions. Among the positions excluded was that of psychologist, without the Board seeking clarification from the PLRB to determine whether psychologists should now be included in the professional (teachers') bargaining unit certified by the PLRB in 1971. Curley received a letter, dated August 1, 1991, from the Superintendent of Schools, Richard S. DeLuca, informing him that the method for determining his pay would no longer depend on the "terms and conditions" of the ACP. Instead, it stated, his salary would be based on the "terms and conditions" of the teachers contract. (20a). The name of his position was not changed to "assistant psychologist;" it remained as "psychologist," nor was there any change in his duties. In the Board's view, when it eliminated the position of assistant psychologist, psychologists were no longer supervisors as defined in the PERA, 43 P.S. § 1101.301(6), and were therefore no longer administrators covered by the ACP. Curley retired at the end of the 1991–1992 school year pursuant to and covered by the ACP early retirement incentive plan.

Curley filed a complaint in mandamus and for declaratory judgment for payments that were due and owing to him under

---

**2.** These included: Director of Curriculum/Chapter I, Director of Special Education, High School Principal, Junior High School Principal, Elementary School Principal(s), Director of Administrative Services, Director of Media Services, Director of Vocational Education, Assistant High School Principal(s), Assistant Junior High School Principal(s), Assistant Elementary Principal(s), Coordinator of the Alternative Program, Supervisor of Reading, Supervisor of TELS/Chapter I Reading, Psychologist(s), Director of Physical Plant, Supervisor of Data Processing Services.

the ACP for the 1991–1992 school year. The trial court ruled that Curley was entitled to be compensated according to the 1989 ACP, and calculated that the difference between what he was due under the 1989 ACP and what he received in compensation for that school year was $3,674.05.

The Board filed the present appeal and Curley filed a motion to dismiss in this Court on the basis that the Board, by failing to file a post-trial motion in the nature of an exception to the trial court's determination, waived any errors and is precluded from raising them on appeal. Judge Lord denied Curley's motion to dismiss on the basis that exceptions need not have been filed to the trial court's order which amounted to a final judgment. Curley did not seek reconsideration of Judge Lord's order denying his motion to dismiss.

 On appeal, Curley renews his claim that appellate review is impossible because the Board has failed to preserve any issues for appeal. Pa.R.A.P. 123(e) provides that the action of a single judge *may* be reviewed by this Court by means of a petition for reconsideration. *See* Internal Operating Procedures, § 331, 210 Pa.Code § 67.47. However, we have held that in the interests of judicial economy and efficiency, there must be a degree of finality to interlocutory orders by another judge in the same case. Therefore, when no petition for reconsideration from an order of a single judge is filed, that order will normally be considered binding.[3] *Hughes*

---

**3.** The exception to this rule is that this Court will reconsider a decision from a single judge if the decision concerns subject matter jurisdiction. This exception is based on the well settled rule of law that, "neither by act of the parties *nor by the act of this Court* can [subject matter] jurisdiction be conferred upon a court where jurisdiction is nonexistent." *Hughes*, (emphasis added), *citing, Re: Estate of Pozzuolo*, 433 Pa. 185, 193, 249 A.2d 540, 545 (1969). Thus, if this Court discovers it lacks jurisdiction over a case, it is compelled to dismiss the matter under all circumstances, even where we erroneously decided the question in a prior ruling. However, here, unlike in *Hughes* where the question of the timeliness of the appeal was an issue, it cannot be said that the alleged failure to file exceptions to the trial court's order deprived this court of subject matter jurisdiction, rather it may only be claimed that no issues would be preserved for review. (*Cf. Ingram v. Department of Environmental Resources*, 141 Pa.Commonwealth Ct. 324, 595 A.2d 733 (1991), *appeal denied*, 530 Pa. 648, 607 A.2d 257,

*v. Pennsylvania State Police,* 152 Pa.Commonwealth Ct. 409, 619 A.2d 390, 393 (1992); *Larocca v. Workmen's Compensation Appeal Board (The Pittsburgh Press),* 140 Pa.Commonwealth Ct. 192, 592 A.2d 757, *appeal denied,* 529 Pa. 659, 604 A.2d 251 (1991). Here, no petition for reconsideration was filed from Judge Lord's pre-argument order, and, therefore, it is binding. We will not revisit Curley's claim that the Board failed to preserve any issues for appeal, and instead will proceed to the merits.

The Board presents two issues for our resolution. First, the Board claims that the trial court, upon finding that Curley was not at least a "first-level supervisor," erred in issuing a writ of mandamus compelling the District to include him in the ACP, because no duty to apply such plans to ineligible school employees is imposed by Section 1164 of the Public School Code. Under Section 1164, eligibility for inclusion in an ACP is limited to those employees below the rank of assistant superintendent, "but including the rank of first-level supervisor, who by virtue of assigned duties is not in a bargaining unit of public employees as created under the ... Public Employe Relations Act." The Board argues that because of the elimination of assistant psychologists, the District's psychologists, including Curley, did not exercise authority over other employees so as to qualify as first-level supervisors. Therefore, psychologists were not administrators and not eligible for inclusion in the ACP. The Board argues that if the psychologists were not supervisors, they were ineligible for coverage and therefore mandamus was improper because the Board had no duty to include Curley in the ACP for the school year 1991–1992. *Travis v. Teter,* 370 Pa. 326, 87 A.2d 177 (1952).

*cert. denied,* —— U.S. ——, 113 S.Ct. 329, 121 L.Ed.2d 248 (1992), where the failure to file a petition for reconsideration after a ruling by a single judge of this Court, denying a motion that a petition for review be quashed on the basis that an estate lacks the capacity to sue, was fatal to raising this issue again on appeal. This Court ruled that the filing of the petition for review on behalf of the estate, rather than by the personal representative, is not an issue which goes to our jurisdiction, and therefore the single judge's ruling was binding.)

■ The basic fallacy of this argument is in equating supervisors with administrators. The Board imports a definition of "supervisor," meaning to have the authority to hire, transfer, promote, discharge, direct, etc., other employees, from the PERA, which gave collective bargaining rights to public employees. Section 301 of PERA, 43 P.S. § 1101.301. The distinction between supervisors and non-supervisory employees is extremely important in the context of collective bargaining, where a supervisory employee is considered to be acting in the interests of the employer, an interest which is often adverse to the rank-and-file employee. Thus, supervisors in both the private and public sectors are not included with rank-and-file members in the same bargaining unit. *Pennsylvania Labor Relations Board v. Cadman,* 370 Pa. 1, 87 A.2d 643 (1952); *H.J. Heinz Co. v. National Labor Relations Board,* 311 U.S. 514, 519, 61 S.Ct. 320, 322, 85 L.Ed. 309 (1941). It is not surprising that the PLRB's 1971 decision was concerned to establish which employees were rank-and-file and which were excluded from the bargaining unit because of their supervisory functions. Using the definition found in Section 301 of the PERA, 43 P.S. § 1101.301(6), the PLRB determined that psychologists were first level supervisors and excluded from the bargaining unit.

■ In contrast, in determining eligibility for an ACP plan, there is no reason to draw a line between supervisory and non-supervisory personnel. The 1989–1993 Greater Johnstown School District ACP did not distinguish between these two categories, and it is not always possible to determine which administrators listed in this ACP were supervisors and which were not. Moreover, the term "supervisor" is not defined in the School Code, only the term, "school administrators" is defined, because supervisory responsibilities is not the criterion used to establish eligibility for an ACP.

The best explanation for why first-level supervisors are mentioned at all in Section 1164 of the School Code can be found in the history of the interpretation of Section 604 of the PERA, (43 P.S. § 1101.604(5)), which states in pertinent part that:

The board [PLRB] shall determine the appropriateness of a unit which shall be the public employer unit or a subdivision thereof. In determining the appropriateness of the unit, the board shall:

(5) *Not permit employes at the first level of supervision to be included with any other units of public employes* but shall permit them to form their own separate homogenous units. In determining supervisory status the board may take into consideration the extent to which supervisory and nonsupervisory functions are performed.

(Emphasis added.)

 The PERA, passed in 1970, gave rank-and-file public employees, including professionals employees such as teachers, the right to be represented by unions, to negotiate contracts, and to strike in the event of an impasse. Although first level supervisors were not given the right to negotiate contracts, collectively bargain, or strike, public employers were required to "meet and discuss" with units of first-level supervisors or their representatives on matters deemed bargainable for other public employees covered by the PERA. Section 704 of the PERA, 43 P.S. § 1101.704. However, management level employees, that is, those who are "involved directly in the determination of policy or who responsibly direct the implementation thereof," are excluded from participation in any labor bargaining unit. Sections 301(2) and 301(16) of the PERA, 43 P.S. §§ 1101.301(2), 1101.301(16).

 Subsequently, in case law construing the PERA, it was held that school principals and assistant principals were management level employees. *Employees of Carlynton School District v. Carlynton School District,* 31 Pa.Commonwealth Ct. 631, 377 A.2d 1033 (1977). Thus, the largest group of first-level supervisors in the school systems, principals and assistant principals, were deemed ineligible to form separate "meet and discuss" bargaining units because they were managerial employees who had policy-making duties. It is likely that "first level supervisors who by virtue of assigned duties [are] not in a bargaining unit of public employes as created

under [PERA]," are specifically mentioned and included in the definition of school administrators in Section 1164 of the School Code, because of and in direct response to the *Carlynton* decision. The Board's argument that because Curley was no longer a supervisory employee, he was not a school administrator who was eligible for the ACP, is based on an erroneous understanding of Section 1164. It was not the intent of this section of the School Code to equate supervisors with administrators and to exclude all but supervisory employees from participation in an ACP, rather first-level supervisors are mentioned in order to insure that such policy-making, managerial, first-level supervisors, such as principals, who were formerly excluded from "meet and discuss" units under the PERA, would now be specifically included in the "meet and discuss" sessions which must occur prior to establishing the administrator compensation plans under Act 93.[4]

▆▆▆▆▆ Thus, in this case of first impression construing Section 1164, we conclude that it was the intent of the School Code to compel school employers to adopt compensation plans, "within the framework of a management team philosophy," (24 P.S. § 11–1164(b)), which would include school administrative employees who were historically excluded from bargaining units of public employees, including the "meet and discuss" units of first-level supervisors. We also conclude that, contrary to the Board's argument, the lack of a supervisory role does *not* make Curley ineligible for inclusion in the ACP, and, thus, we find no merit to the Board's argument that the trial court's issue of the writ of mandamus compelling the Board to

4. While it is clear from a plain reading of the statute that formerly excluded, first-level supervisors are *included* among the employees, "below the rank of district superintendents, executive directors, directors of vocational-technical schools, assistant district superintendents or assistant executive directors", who are eligible to participate in the administrator compensation plans. Section 1164(a), it is not so clear who is *excluded*, and how far below these ranks coverage extends. We do agree with one commentator, however, that it was not contemplated that rank-and-file members of bargaining units primarily teachers, would be "school administrators" for the purposes of administrative compensation plans. James L. Fritz, Comment, *Pennsylvania's Unique Approach to School Administrator Bargaining Rights*, 90 Dickinson L.R. 487, 496 (1985).

include Curley in the ACP was improper because Curley allegedly did not qualify as an administrator.

Second, the Board argues that even though it may be determined that Appellee is an eligible administrator within the meaning of Section 1164 of the School Code, Curley still should not be compensated under the terms of the ACP. The Board claims it complied with all the procedural obligations of Section 1164(c) in the summer of 1991 when it met and discussed revisions to the 1989 ACP. The Board argues that it had the right to adopt an administrative plan as it saw fit, and it exercised that right in adopting the 1991 ACP which excluded psychologists, including Curley, from coverage. It relies on the statutory definition of "meet and discuss" in the PERA and the case law construing Act 195 (43 P.S. § 1101.702), which states that "inherent managerial policy" is not a matter for collective bargaining, but public employers must, nevertheless, "meet and discuss" with their employees those policy matters which affect the terms and conditions of their employment. *Pennsylvania Labor Relations Board v. Association of Pennsylvania State College and University Faculties*, 24 Pa.Commonwealth Ct. 337, 355 A.2d 853 (1976); 43 P.S. § 1101.301(17).

The trial court conceded and we affirm that "meet and discuss" requirements do not impose an obligation on the Board to accept any recommendations made by school administrators regarding the terms and conditions of their compensation; in other words, the trial court held that the "meet and discuss" session was not a collective bargaining session. But, the court would not accept the Board's argument that it may change, at any time, the terms or conditions of the ACP during the life of the plan. The Board's assertion that it has unlimited prerogative so long as it engages in good faith in a "meet and discuss" session is again based on a misapplication of case law interpreting "meet and discuss" sessions under the PERA.

Under the PERA, "meet and discuss" sessions exist as a device to permit input or recommendations from

first-level supervisors on policy matters affecting wages, hours and terms and conditions of employment so as to assist the public employer in ultimately making its disposition of the issues in question. *Independent State Store Union v. Pennsylvania Labor Relations Board,* 119 Pa.Commonwealth 286, 547 A.2d 465 (1988). In contrast, Section 1164 of the School Code requires school employers to, "meet and discuss" in good faith with the school administrators *prior to* the adoption of a written compensation plan. 24 P.S. §§ 11–1164(c), (d). While these "meet and discuss" sessions are advisory and are not bargaining sessions, they are a pre-requisite to the adoption of a mandatory, written ACP which contains, at a minimum, a description of the program determining administrative salaries, salary amounts and fringe benefits, and which continues in effect until a time specified in the compensation plan, or a minimum of one year. Thus, in comparing "meet and discuss" sessions under the PERA and the School Code, it may be seen that although there are certain similarities, there is a different context for each of these sessions, one is to formulate a compensation plan which will then remain in effect for the life of the plan, and the other is to discuss issues and air grievances.

The question then turns on whether the plan adopted after the "meet and discuss" session may be revised at any time so long as a "meet and discuss" session precedes the adoption of the revision, or whether it is binding, once adopted, for the life of the plan.[5] We hold that it is binding for a variety of reasons. First, it has been suggested that one of the objectives of the Legislature in enacting Section 1164 was to eliminate the administrators' insecurity over compensation matters. *Fritz, supra,* at 501. Surely, a non-binding plan would do little to eliminate this insecurity. More significantly, Section 1164 provides that school employers are required to adopt a written ACP, *"which shall continue in effect until a time specified in the compensation plan, but in no event for*

---

5. We want to make it clear that when we say an ACP is binding for the life of the plan, we do not mean that the ACP is itself a contract or a collective bargaining agreement.

*less than one school year." Id.* This language implies that an ACP is binding, for if it were not, it would not be possible for it to continue "in effect" for the time specified in the plan. The General Assembly, in enacting a statute, does not intend a result that is absurd, impossible of execution or unreasonable. 1 Pa.C.S. § 1922(1). Therefore, given all these considerations, we must conclude that an ACP is a binding document once adopted.

█ Although the ACP adopted in 1989 states that it "shall be in full force and effect from the period July 1, 1989 through June 30, 1993," the Board, after meeting with administrators, revised the ACP in 1991 to exclude psychologists. Since we have concluded above that psychologists were not automatically excluded from participation in the ACP when they lost their supervisory duties, and because the District is bound by the provisions of the ACP during the period in which the plan is in effect, it may not change the provisions of the plan. We agree with the trial court that, "all administrators in the 1989 plan are entitled to be compensated for their services according to the provisions of that plan."

Accordingly, we affirm the order of the trial court stating that Curley is entitled to be compensated under the terms of the 1989 ACP and is thus entitled to additional compensation in the amount of $3,674.05.

## ORDER

AND NOW, this 4th day of May, 1994, the order of the Court of Common Pleas of Cambria County in the above-captioned matter is hereby affirmed.