**Joseph DEMKO, Plaintiff,**

v.

**LUZERNE COUNTY COMMUNITY COLLEGE, Defendant.**

**No. 3:CV–98–0495.**

United States District Court,
M.D. Pennsylvania.

Sept. 18, 2000.

Al Flora, Jr., Wilkes-Barre, PA, for Joseph Demko.

Alexia Kita Blake, Hourigan Kluger Spohrer, Scranton, PA, Paul K. Paterson, Scranton, PA, for Luzerne County Community College.

## MEMORANDUM

VANASKIE, Chief Judge.

On March 25, 1998, the plaintiff, Joseph Demko, brought this action against the defendant, Luzerne County Community College ("LCCC" or "the College"), under 42 U.S.C. § 1983, for alleged violations of civil rights and under state law for breach of contract. (Dkt. Entry 1.) LCCC employed Demko in its Financial Aid Department, and the complaint arises from the circumstances of LCCC's discharge of

Demko from his position. Demko's complaint contains two counts. Demko's first count alleges that LCCC denied him due process related to both property and liberty interests when it discharged him. The second count alleges that LCCC breached a contract between it and Demko that Demko maintains restrained LCCC from discharging him without "just cause."

Currently pending are summary judgment motions from both parties. All the issues have been briefed and are ripe for decision.

Because LCCC did not have statutory authority to enter into a non-at-will employment contract with Demko, the alleged contract was void *ab initio*. As such it did not entitle Demko to any property interest in his continued employment with LCCC. Because Demko had no property interest in his job, he was not entitled to a hearing in connection with the decision to fire him. Accordingly, LCCC's motion for summary judgment on Demko's claim for a deprivation of property rights without due process will be granted, and Demko's motion on that issue will be denied.

Because the contract was void *ab initio*, the contract is unenforceable. Accordingly, LCCC's motion for summary judgment on the pendent state law claim for breach of contract will be granted, and Demko's motion will be denied.

Because LCCC made public allegations of sexual harassment against Demko at the time of his dismissal, Demko had a liberty interest in clearing his good name and reputation that required the College to afford Demko due process in connection with the decision to fire him. Because the College afforded Demko an adequate opportunity to be heard before he was fired, and state law accorded Demko a full panoply of post-termination procedural rights, the requirements of due process were satisfied in this case. Accordingly, the College's motion for summary judgment on Demko's claim of deprivation of a liberty

interest without due process will be granted, and Demko's motion will be denied.

## I. BACKGROUND

Demko worked at the College, in various capacities, from November 1974 until his discharge in November 1997. (Statement of Material Facts to which the Def. Contends there is no Material Dispute, Dkt. Entry 29 at ¶¶ 5–7.) In November of 1991, he was named Financial Aid Officer of LCCC. As an administrator of LCCC, Demko had executed an employment agreement with LCCC on an annual basis. On September 29, 1997, Demko signed a "Professional Employment Contract" with LCCC that covered the period October 1, 1997 through September 30, 1998. (*Id.,* ¶ 5 and Ex. 2.) This agreement provided that Demko would "perform the duties assigned to [the Financial Aid Director] in keeping with the general operational policies of [LCCC] and the policies, rules and regulations adopted by the Board of Trustees of [LCCC]." (*Id.*) The phrase, "policies adopted by the Board of Trustees," encompassed LCCC's personnel policy manual applicable to administrators such as Demko. (Pl.'s Statement of Material Facts, Dkt. Entry 39 at ¶ 11.) The personnel policy manual stipulated that "[e]mployees may be terminated or suspended for just cause," and that "[s]uch discharge should be completed in conjunction with all due process and contractual rights entitled to by the employee." (*Id.* at ¶ 12.) The personnel policy manual, however, did not specify the "due process and contractual rights" to which an employee was entitled. (Larson Dep., Ex. 2 to Pl.'s Statement of Material Facts, Dkt. Entry 40 at 13.)

At the time that Demko executed the Professional Employment Contract covering the period October 1, 1997 through September 30, 1998, he was on "probation" on account of a complaint made by Barbara Brody, a female subordinate of Dem-ko who charged Demko with using vulgar language and creating a hostile work environment. (Pl.'s Statement of Material Facts in Opp'n To Def.'s Summ. J. Mot., Dkt. Entry 48 at ¶ 1.) Brody began work as a clerk in the Financial Aid Department in 1994. (Demko Dep., Dkt. Entry 31.) Sometime prior to April of 1995, Brody complained to College administrators that Demko had sexually harassed her. (*Id.* at 34.) On April 3, 1995, Demko met with Susan Merkle, Associate Dean of Human Resources, Thomas Leary, Dean of Admissions and Student Affairs, and Ann Williams, Dean of Community Services and Continuing Education. (*Id.* at 32.) At this meeting, Demko and the College administrators discussed the complaints that Brody had made. (*Id.* at 34.) The administrators gave Demko the opportunity to respond to Brody's complaints. (*Id.* at 39.) Demko generally denied the allegations of sexual harassment, but he did not deny that he had used vulgar language in the Financial Aid Department. (*Id.* at 35.) Shortly after the meeting of April 3, 1995, Demko received a letter from Leary in which Leary explained that the College concluded that Demko had "made remarks to Ms. Brody that had sexual or demeaning implications." (*Id.* at 40 & Ex. 3.) The letter also stated that Demko must attend seminars "dealing with issues on Management Skills and Harassment . . . ." (*Id.*) The letter further informed Demko that he had the right to "exercise the option of a formal hearing."[1] Finally, the letter concluded that "[a] repetition of the behavior cited in this communication may result in termination of services by [LCCC]." (*Id.*)

On May 8, 1997, Demko again met with Leary. They discussed Demko's continued use of vulgar language and the amount of time he spent counseling students. (*Id.* at 54.) At this meeting, Demko admitted that he continued to use vulgar language "periodically." (*Id.* at 56.) Leary gave

---

1. There is no indication that Demko requested a formal hearing in connection with the matters raised in the April 3, 1995 letter.

Demko the opportunity to respond to issues that the two discussed at this meeting. (*Id.* at 58–59.) Shortly thereafter, Demko received a letter in which Leary summarized their May 8, 1997 meeting. (*Id.* at 59 & Ex 4.) The letter "strongly advise[d]" Demko that "[v]ulgarity and profanity will not be tolerated," and that Leary would "not hesitate to initiate the process of termination if progress is not immediately made . . . ." (*Id.* at Ex. 4.)

In May of 1997, Brody again complained to administrators that Demko used vulgar language and created a hostile work environment in the Financial Aid Department. (Pl.'s Statement of Material Disputed Facts in Opp'n to Def.'s Mot. for Summ. J., Dkt. Entry 48 at ¶ 1.) On June 9, 1997, the College placed Demko on probation, and he was again informed that he must "attend training seminars relative to issues on management skills and sensitivity." (Dkt. Entry 31 at 63 & Ex. 5.) Demko's probationary period extended through December 19, 1997, at the conclusion of which LCCC was to "render a decision relative to the probation status." (*Id.*)

On October 28, 1997, Brody filed a complaint of sexual harassment with the Pennsylvania Human Relations Commission ("PHRC"). (Dkt. Entry 48 at ¶ 2.) On November 5, 1997, Demko met with Leary and Merkle, and they discussed the complaint that Brody had filed. (Dkt. Entry 31 at 66.) Merkle gave Demko a copy of Brody's complaint. (*Id.*) At this meeting, Demko was put on paid administrative leave, and Leary suggested that Demko should retain counsel. (*Id.* at 68–70.)

Merkle conducted an investigation into the Brody PHRC complaint, interviewing four of the five full-time employees in the Financial Aid Department. The fifth person, Brody, refused to be interviewed on advice of counsel. (Dkt. Entry 29 at ¶ 25.) On November 12, 1997, Demko met with Merkle to discuss the Brody PHRC complaint. (Dkt. Entry 31 at 72.) At this meeting, Demko had the opportunity to respond to Merkle's questions and to offer any information relative to Brody's complaint. (*Id.* at 76–77.)

Merkle made the determination that Demko continued to use vulgar language after the College put him on probation on June 8, 1997. (Dkt. Entry 29 at ¶ 24.) Further, Merkle concluded that a hostile work environment existed in the Financial Aid Department. (*Id.* at ¶ 31.)

On November 24, 1997, Demko met with Merkle and Jon Larson, President of the College. (Dkt. Entry 31 at 167 and Larson Dep., Dkt. Entry 35 at 65–70.) At that meeting, Larson gave Demko a letter stating that the College was discharging Demko for "continued inappropriate conduct." (Dkt. Entry 31 at 167.) On December 4, 1997, counsel for Demko requested a "formal due process hearing to challenge the termination of his employment." (Dkt. Entry 29 at Ex 6.) On January 19, 1998, counsel for the College confirmed that the College "[did] not intend to offer [Demko] any post-termination hearing." (*Id.* at Ex. 7.) On March 25, 1998, Demko brought suit in this Court.

## II. DISCUSSION

### A. *Summary Judgment Standard*

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Initially, the moving party must show the absence of a genuine issue concerning

any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 329, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982).

Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. The affirmative evidence must consist of verified or documented materials. Mere conclusive allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990); *see also Hampton v. Borough of Tinton Falls Police Dep't,* 98 F.3d 107, 112 (3d Cir.1996) ("In order to defeat 'a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor.'" (quoting *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995))); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996) ("If the movant meets this burden, then the opponent ... must counter with specific facts which demonstrate that there exists a genuine issue for trial."). Rule 56(e) requires the entry of summary judgment, after adequate time for discovery, when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *see also Orson,* 79 F.3d at 1366.

The Third Circuit recently summarized the burden of the nonmoving party:

> [I]f a moving party satisfies its initial burden of proving a prima facie case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Rather, "[t]here must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted."

*Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998) (citations omitted).

### B. Demko's Property Interest in his Job

To have a property interest in a governmental position, a person must "have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ....'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Roth, supra*). Courts have recognized that a "for-cause" termination provision in an enforceable employment agreement or statute may establish a protected property interest. *See Linan–Faye Constr. Co. v. Housing Auth. of City of Camden,* 49 F.3d 915, 932 (3d Cir.1995); *Sanguigni v. Pittsburgh Bd. of Public Educ.,* 968 F.2d 393, 401 (3d Cir.1992); *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1399 (3d Cir.1991).

Demko contends that he was a party to a valid one-year contract for the period of October 1, 1997 to September 30, 1998. (Pl.'s Br. in Supp. of his Mot. for Summ. J. and in Opp'n to Def.'s Mot. for Summ. J., Dkt. Entry 47 at 1 & Dkt. Entry 31 at Ex. 2.) The contract in question reads: "I accept this assignment on the conditions listed above and will perform the duties assigned to said position in keeping with the general operational policies of the College and the policies, rules and regulations adopted by the Board of Trustees ...."

(Dkt. Entry 31 at Ex. 2.) Demko argues that the contract explicitly incorporated policies set forth in the College's personnel policy manual that guarantee that the College would not discharge employees without "just cause." (*Id.*)

The College refutes the validity of the contract, *citing Shoemaker v. City of Lock Haven*, 906 F.Supp. 230 (M.D.Pa.1995) (McClure, J.), for the proposition that a written contract is unenforceable if the contracting public entity lacked the authority to enter into the contract. The College argues that the enabling legislation for community colleges lacks the explicit authority for the College to enter into such contracts and that Demko's contract was therefore "neither valid [nor] enforceable." (Def.'s Br. in Supp. of Mot. for Summ. J., Dkt. Entry 30 at 6.)

Demko argues that three separate pieces of legislation authorize community colleges to enter into employment contracts that are not terminable at will: the Public School Employees Retirement Code, 24 Pa. Stat. Ann. § 8180 *et seq.;* the Pennsylvania Public School Code, 24 Pa. Stat. Ann. § 19–1901–A *et seq.*, in conjunction with regulations of the State Board of Education, 22 Pa.Code § 35.11(c); and the Pennsylvania Employees Relations Act ("PERA"), specifically, 43 Pa. Stat. § 1101.301(19). (Dkt. Entry 47 at 11–13.) The College relies on *Shoemaker*, arguing that the legislation that Demko cites does not satisfy the requirement that a public entity's enabling statute explicitly grant the entity the authority to contract with its employees in contravention of employment-at-will.

In *Shoemaker*, the court considered a contract between a Third Class City and its Chief of Police. *Id.* at 235. The city had entered into a contract with the Chief, agreeing that the city would not remove him for a probationary period of six months without "just cause." *Id.* at 233. The court found that such an agreement would create a property interest if the city had the authority to enter into such a contract. *Id.* at 233. However, *Shoemaker* went on to hold that the city lacked, *ab initio*, the authority to enter into such a contract, and that the contract in question was therefore void. *Id.* at 236.

The court scrutinized the city's enabling legislation, 53 Pa. Cons.Stat. Ann. §§ 41101–41625, and held that the language provided only general powers—powers that were inadequate to authorize the city to enter into a contract for a time certain with the Chief of Police. *Id.* In so holding, *Shoemaker* principally relied on *Scott v. Philadelphia Parking Auth.*, 402 Pa. 151, 166 A.2d 278 (1960), and *Cooley v. Pennsylvania Hous. Fin. Agency*, 830 F.2d 469 (3d Cir.1987). *See also Pivarnik v. Commonwealth*, 82 Pa.Cmwlth. 42, 45, 474 A.2d 732 (1984) ("In Pennsylvania, public employees gain an enforceable expectation of continued employment in their jobs through legislative action."); *Stumpp v. Stroudsburg Mun. Auth.*, 540 Pa. 391, 658 A.2d 333, 334 (1995).

*Scott*, like the case *sub judice*, involved a written contract between a public entity and an employee. The court in *Scott* described the issue confronting it as follows:

> We are asked to determine the validity of a contract which gives an appointed employee of a public authority a tenure for a period of three years at a fixed salary. The primary issue as we see it is not, as the parties have argued, whether the instant contract is unenforceable as an attempt to bind the succeeding members of the Authority, but whether the making of the contract in the first place was beyond the power of the Authority and hence initially invalid.

*Id.* at 280. The court held that the Authority did not have such power. Hence, the contract was unenforceable.

*Stumpp* also addressed a contract between a public entity and one of its employees, and held:

> As an initial matter, the Authority simply does not have the power under law to enter into contracts of employment

that contract away the right of summary dismissal, since the power to confer tenure must be expressly set forth in the enabling legislation. *Scott v. Philadelphia Parking Authority,* 402 Pa. 151, 166 A.2d 278 (1960); *Bolduc v. Board of Supervisors,* 152 Pa.Cmwlth. 248, 618 A.2d 1188 (1992), *appeal denied,* 533 Pa. 662, 625 A.2d 1195 (1993).

658 A.2d at 334. *Stumpp,* a 1995 case, went on to explicitly reaffirm the 1960 *Scott* decision: "This holding has not been abrogated by either this Court or by the legislature. Appellee presents no case law that refutes the explicit holding of this case." *Id.* at 335.

In *Cooley,* the Third Circuit also addressed the legislative authority for a public entity, the Pennsylvania Housing Finance Agency, to enter into employment contracts. *Id.* at 473. However, *Cooley,* unlike *Scott,* did not involve a written contract; rather it involved the employee's claims that the agency's employee handbook had created certain property interests. *Id.* at 472.[2] Our Court of Appeals held that in the absence of a specific grant of legislative authority for the public entity to enter into employment contracts that are not terminable at will, the handbook could not support the plaintiff's claim to a property interest. The court explained:

> [W]e do not find the requisite legislative mandate within the enabling statute to bestow a right upon the agency to enter into employment contracts with its employees. Therefore, Cooley's claim that the contents of the manual embody this contract is void *ab initio* as no power to contract exists.

*Id.* at 473. *See also Verney v. Pennsylvania Turnpike Comm'n,* 903 F.Supp. 826, 835 (M.D.Pa.1995) (Caldwell, J.) ("In applying the holdings of *Scott* and *Stumpp* to the facts of this case, Defendants argue that the statute ... does not grant the Commission the power to contract for a term of employment. Thus, Defendants contend the Commission does not have the power to create an implied in fact contract, and we agree."); *Banks v. Redevelopment Auth. of Philadelphia,* 416 F.Supp. 72, 72–73 (E.D.Pa.1976), *aff'd,* 556 F.2d 564 (3d Cir.), *cert. denied,* 434 U.S. 929, 98 S.Ct. 414, 54 L.Ed.2d 288 (1977) ("Pennsylvania law does not allow a state agency to create tenure unless the legislature specifically grants the agency the power to do so. *Mahoney v. Philadelphia Housing Authority,* 13 Pa.Cmwlth. 243, 320 A.2d 459 (1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975).").

■ *Scott, Cooley,* and their progeny make it clear that for a public employee to claim a property interest in employment in Pennsylvania, the agency must have the specific authority to create that interest. Accordingly, the enabling legislation for community colleges must be examined.

The establishment and operation of community colleges within the Commonwealth of Pennsylvania is authorized by 24 Pa. Stat. Ann. § 19–1901–A *et seq.* Section 19–1905–A delineates the power and duties of the board of trustees of a community college. Subsection (a) of § 19–1905–A, in pertinent part, authorizes the board:

> (1) To appoint and fix the salary of a president ....

> (5) To make policies providing for the admission and expulsion of students, the courses of instruction, the tuition and fees to be charged and for all matters related to the government and administration of the college ....

> (8) To exercise such other powers and perform such other duties as are necessary to carry into effect the purposes of this act.

Demko argues that the College's authority under (a)(5) "necessitates the hiring of qualified personnel as part of a broad based educational scheme." (Dkt. Entry

---

**2.** Significantly, Demko relies, at least in part, on a personnel policy manual that he contends guaranteed that he would be dismissed only for "just cause." Thus, *Cooley* is an especially pertinent precedent here.

47 at 12.) *Scott* considered similarly broad enabling legislation:

> Under its enabling legislation, Act of June 5, 1947, *supra,* the Authority is granted "all powers necessary or convenient for the carrying out of the aforesaid purposes" including the power "... (7) To appoint officers, agents, employees and servants; to prescribe their duties and to fix their compensation;" and the power "... (10) To make contracts of every name and nature, and to execute all instruments necessary or convenient for the carrying on of its business." § 5, 53 P.S. § 345.

*Id.* at 280 (omissions in original). The court interpreted this language to empower the public entity "to *appoint* officers, employees and agents and to fix their compensation, *not* to enter into contracts of employment." *Id.* at 282 (emphasis in original). The language that *Scott* considered is as broad, if not broader, than the enabling language for LCCC. Nevertheless, *Scott* held that the legislation did not authorize the public entity to enter into employment contracts for a time certain.

The enabling language in *Cooley* was equally broad; the legislation in question allowed the public entity:

> (3) To enter into contracts of all kinds and to execute all instruments necessary or convenient for carrying on its operations.
>
> \*    \*    \*    \*    \*    \*

(14) Employ an executive director and other officers, agents, [employees], professional and business advisors as may from time to time be necessary in its judgment and to fix their compensation; and to promote and discharge such officers, [employees], and agents.

\*    \*    \*    \*    \*    \*

(17) To do all things necessary if convenient to carry out the powers granted by this act or other acts. 35 Pa.C.S.A. § 1680.205.

*Id.* at 472 (omissions in original). Despite this broad language, the Third Circuit found that "these grants of power did not give the Redevelopment Authority the ability to create regulations which altered dismissal at will, the traditional Pennsylvania rule regarding public employees not holding specified tenured positions." *Id.*[3]

■ Demko cites *Northampton County Area Community College v. Dow Chem., U.S.A.,* 389 Pa.Super. 11, 24, 566 A.2d 591 (1989), for the proposition that community colleges are independent of municipalities and authorities. (Dkt. Entry 47 at 11.) Demko argues that the College need not have express authority to enter into contracts because "it is neither a municipality nor [an] authority." *(Id.)* Northampton *addressed issues unrelated to those* sub judice—*the court addressed* nullum tempus and the related doctrine of sovereign immunity. Only in that context did the

---

**3.** *Perri v. Aytch,* 724 F.2d 362 (3d Cir.1983), which held that a state court probationary employee had a property interest in her employment, is distinguishable because at issue in that case, and absent here, was the "the importance of preserving the independence of the judiciary by allowing it to hire and fire its own employees free of interference from the other branches of government." *Id.* at 364. Thus, the legislature's explicit authorization to enter into employment contracts with court personnel for a fixed time period was not required as to the court employee in *Perri.* Significantly, the court in *Perri* acknowledged the general rule that "administrative agencies in Pennsylvania do not have the power to grant tenure absent the legislature's permission to do so." *Id.* Also distinguishable is

*Abraham v. Pekarski,* 537 F.Supp. 858 (E.D.Pa.1982), *aff'd,* 728 F.2d 167 (3d Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984), which found a city engineer had a property interest in his public employment because of the interplay of a Township *ordinance* prohibiting his removal "without just cause" and case law under the Local Agency Law, 2 Pa. Cons.Stat. Ann. §§ 551, *et seq.,* recognizing that the discharge of a public employee protected by such an ordinance constituted an adjudication of a property interest. No such legislative authorization is present here. *Abraham* is also distinguishable because it did not address whether the Township ordinance was beyond the authority of the Township's governing body.

court find that community colleges are independent of their sponsors. In the context of a public entity's authority to enter into employment contracts, such a label is irrelevant.[4]

■ Neither *Scott* nor *Cooley* made such a distinction when they applied the rule that the authority to alter employment-at-will must be express. The plaintiff in *Scott* worked for the "Philadelphia Parking Authority" which was not a state agency, but the court applied the reasoning of a prior case which dealt with a state agency employee, noting that the reasoning of the prior case was "applicable in general . . . ." *Id.* at 280. *Cooley*, on the other hand, involved a state agency, the Pennsylvania Housing Finance Agency. *Id.* at 470. The reasoning of these precedents does not turn on the status of the agency, but instead turns on the content of the enabling legislation. In this case, the community college enabling legislation does not authorize the College to alter the employment-at-will status of administrators such as Demko.[5]

Demko next cites the Public School Employees' Retirement Code ("PSERC"), 24 Pa. Cons.Stat. Ann. § 8101 *et seq.*, as authority for the College to enter into a contract for a time certain. (Dkt. Entry 47 at 12.) Neither the statute, nor the case on which Demko relies, *Newport*

*Township v. Margalis,* 110 Pa.Cmwlth. 611, 532 A.2d 1263 (1987), is applicable to the issues *sub judice.* Nowhere in PSERC is there language that explicitly authorizes an agency to enter into a contract for a time certain with its employees. Further, *Margalis* does not even address PSERC, but addresses public employee retirement benefits in general.

Demko also argues that the Pennsylvania Employee Relations Act ("PERA") provides the statutory authority for the College to enter into a contract for a time certain. (Dkt. Entry 47 at 13.) He cites *Curry v. Pennsylvania Turnpike Comm'n,* 843 F.Supp. 988, 990 (E.D.Pa.1994), in support of this argument. While it is true that *Curry* addressed the authority of a public entity to enter into contracts with "collective bargaining" units under PERA, *id.* at 991, it is undisputed that Demko was not a member of a union. Furthermore, the fact that Demko may have been a "first-level supervisor," as that term is defined in PERA, with whom LCCC was required to "meet and discuss" on matters deemed bargainable for other public employees covered by PERA does not mean that his contract was covered by PERA. Demko has not presented any facts that support an inference that his agreement was part of an administrator compensation

4. Community colleges are "local agencies" for purposes of Pennsylvania's Local Agency Law. *McDaniels v. Flick,* 59 F.3d 446, 460–61 (3d Cir.1995), *cert. denied,* 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996).

5. Demko argues that *Small v. Juniata College,* 452 Pa.Super. 410, 682 A.2d 350 (1996), stands for the proposition that "just cause" clauses can create property entitlements for employees. Earlier, however, he notes that he "has not alleged that the personnel policies of the College, independent of his written contract, create an employment contract." (Dkt. Entry 47 at 10.) The "just cause" argument, however, sidesteps the holding of *Scott* and *Cooley.* A public entity must first have the authority to enter into an employment contract before it can offer limitations on discharge from that employment. In any event, *Small* involved a private institution.

Demko also relies on *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), as support for the argument that the College created a tenure "system in practice." (Dkt. Entry 47 at 10.) *Perry* is inapposite for a variety of reasons. Foremost is the fact that it addressed a college system in Texas. Here the issue is whether Pennsylvania law allows a public entity to contract with its employees for a time certain. Second, *Perry* relied, at least to some extent, on the plaintiff's claims that the college had violated his First Amendment rights; here there is no such claim.

Demko also cites *Stana v. School Dist. of Pittsburgh,* 775 F.2d 122 (3d Cir.1985), in support of his claims. That case, however, does not address the issue of a public entity's authority to contract with its employee, but rather the issue of an applicant's right to remain on an "eligibility list."

plan covering first-level supervisors.[6] Accordingly, PERA affords no predicate for recognition of a property interest here. As stated in *Shoemaker*, 906 F.Supp. at 235: "PERA ... deals exclusively and specifically with the right of public employers to enter into collective bargaining agreements, the right of public employees to organize, etc. *See* 43 P.S. § 1101.101. No collective bargaining agreement or related issue is raised here."

■ *Scott* and *Cooley* are clear: the statutory language authorizing employment contracts must be explicit. A court may not infer the legislature's intent from a statute that is on the fringe of the issue. The statute must forthrightly confer the right to contract with employees for a time certain or to abrogate the at-will employment doctrine. If it does not, then the public entity does not have the authority to do so. PERA plainly does not grant to the College the authority to establish non-at-will employment for a *non-union* employee.

Demko claims that the yearly renewal of administrators' contracts was "automatic" and that it therefore created a "de facto tenure." (Dkt. Entry 47 at 9.) This argument, of course, fails for the same reasons that Demko's express contract claim fails: the College did not have the authority to enter into a contract with Demko that was not terminable at will.[7] Without the au-

thority to enter into such contracts, the College could enter into neither an explicit nor an implicit, "de facto," contract with Demko.

Because the College did not have the authority to enter into a contract with Demko, he had no property interest in his employment. And because he had no property interest in his employment, Demko had no due process rights related to his continued employment. *Cooley*, 830 F.2d at 473 ("We therefore hold that *Cooley* is devoid of any proprietary interest in his employment which would afford him the protections of the due process clause."). Accordingly, summary judgment in favor of the College on Demko's deprivation of property claim is appropriate.

Count Two of Demko's complaint is a pendent state breach of contract claim. For the reasons stated above, that claim must be denied. The College did not have authority to enter into the contract, and it is therefore unenforceable. Accordingly, I will grant the College's motion for summary judgment as it relates to that claim.

### C. Demko's Liberty Interest in his Reputation

■ "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Roth*, 408 U.S. at 572, 92 S.Ct. 2701 (citing *Bolling v. Sharpe*, 347 U.S. 497, 499–500,

---

6. Demko's reliance on *Curley v. Board of Sch. Dir. of the Greater Johnstown Sch. Dist.*, 163 Pa.Cmwlth. 648, 641 A.2d 719 (1994), is misplaced. That case dealt with the effect of the "meet and discuss" provision in § 1164 of the Public School Code, 24 P.S. § 11–1164, and not with PERA's "meet and discuss" provision, 43 P.S. § 1101.704. The court in *Curley* noted that there were significant distinctions between those two statutes, with the latter imposing no requirements on public employees beyond meeting and discussing bargainable issues with non-union employees.

7. Demko does not argue equitable estoppel. *Shoemaker* noted some disagreement as to the application of equitable estoppel to the doctrine of employment-at-will in Pennsylvania. However, here, like in *Shoemaker*, I need not

reach the issue. Demko has not alleged "negligent misrepresentation of a material fact inducing [him] to act to his detriment," *id.* at 236–37, and accordingly he has no claim on that issue. It is noteworthy, however, that *Stumpp*, 540 Pa. 391, 658 A.2d 333 at 336, forthrightly addressed the issue of equitable estoppel in Pennsylvania, and held:

[E]quitable estoppel has been affirmatively rejected by this Court as an exception to the at-will rule. In *Paul v. Lankenau Hospital*, 524 Pa. 90, 569 A.2d 346 (1990), we held that "[t]he doctrine of equitable estoppel is not an exception to the employment at will doctrine. An employee may be discharged with o[r] without cause, and our law does not prohibit firing an employee for relying on an employer's promise."

74 S.Ct. 693, 98 L.Ed. 884; and *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551). "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Roth,* 408 U.S. at 573, 92 S.Ct. 2701 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). *See also Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that future employment rights may be liberty interests). The fact that Demko did not have a property interest in his employment is not fatal to his deprivation of liberty claim. *Brady v. Gebbie,* 859 F.2d 1543, 1553 (9th Cir.1988), *cert. denied,* 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989); *Melo v. Hafer,* No. 89–2685, 1992 WL 396816, *3, 1992 U.S. Dist. LEXIS 19540 at *13 (E.D.Pa. Dec. 22, 1992) ("[F]ailure to prevail on a property claim does not bar a properly asserted liberty claim.").

■ In the employment context, courts frequently address a deprivation of liberty in terms of stigma. "[T]he hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely "to provide the person an opportunity to clear his name."" *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). As recognized in *Melo,* 1992 WL 396816 at *3, 1992 U.S. Dist. LEXIS 19540 at *12, "the opportunity for a name-clearing hearing must be afforded."

■ In this case, the College effectively published a statement that Demko had been fired for sexual harassment. Clearly, being labeled a sexual harasser is stigmatizing. Demko adamantly denied the charge. Under these circumstances, Demko's firing implicated a liberty interest in his reputation such that he was entitled to an opportunity to clear his name.

■ The College argues that the published statement surrounding Demko's discharge were not false. (Dkt. Entry 50 at 2.) This argument misses the mark. The question is not whether the published statement was accurate, but whether Demko contested the accuracy of the charge of sexual harassment. Only if the employee does not challenge the substantial truth of the publicized basis for his or her firing is an opportunity to clear one's name obviated. *See Codd,* 429 U.S. at 627, 97 S.Ct. 882.

■ In short, the College's dissemination of the reasons for Demko's discharge implicated a liberty interest. Under these circumstances, he was entitled to an opportunity to be heard before he was fired and the press release issued. See *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 690 n. 9 (8th Cir.1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999). A pre-deprivation hearing that satisfies the requirements of *Loudermill* is adequate. *Wallin,* 153 F.3d at 690 n. 9. *Loudermill* concluded that "all the process that is due is provided by a pretermination opportunity to respond coupled with post-termination administrative [or judicial] procedures ...." 470 U.S. at 547–48, 105 S.Ct. 1487.

Demko does not dispute that *Loudermill* establishes the parameters for a pre-termination hearing. He does dispute, however, the adequacy of the process afforded him.

In *Scarnati v. Washington,* 599 F.Supp. 1554 (M.D.Pa.), *aff'd,* 772 F.2d 896 (3d Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986), the Veterans Administration ("VA") discharged a non-tenured physician. The plaintiff contended that his firing for incompetence stigmatized him in his profession. *Id.* at 1557. After holding that the plaintiff had no property interest in his job, the court considered his liberty interest claim, and held that pre-termination hearings were sufficient process to protect that interest. The court first held that Scarnati had himself published the facts surrounding his dismissal, but went on to hold that even if the VA had infringed on Scarnati's liberty

interest, the VA provided all the process required when "the plaintiff ... appeared before the [board] twice and had ample notice of the charges being considered, as well as the opportunity to counter them." *Id.* at 1559. Scarnati also contended that the VA violated his due process rights because "he had never seen three of the twelve exhibits presented to the [board]" that were complaints about his job performance. *Id.* at 1558. The court held that "plaintiff was not entitled to copies of all material reviewed by the [board]." *Id.* at 1559.

▆▆ Demko offers a similar, but even less convincing argument. He argues that the College administrators did not question him about each complaint related to the charges of sexual harassment. (Dkt. Entry 47 at 18.) Demko does not refute, however, that the administrators supplied him with a copy of the PHRC complaint on November 5, 1997. (Dkt. Entry 31 at 66.) Nor does he refute that at the November 12, 1997 meeting he had the opportunity to respond to Merkle's questions and to offer any additional information he wished Merkle to have. (*Id.* at 76–77.)

*Scarnati* held that two pre-termination hearings before a three person board were sufficient to satisfy the plaintiff's due process rights to protect a liberty interest. *Id.* at 1559. In the case *sub judice*, the College afforded Demko two separate pre-termination meetings: on November 5 and 12, 1997. The length and subjects of these meetings varied, but they addressed the charges which resulted in the College's dismissal of Demko. Moreover, Demko had received a copy of the PHRC complaint seven days before his meeting with

Ms. Merkle. At the time he knew he was on probation and that his employment was in jeopardy. While Ms. Merkle may not have asked him about every charge in the PHRC complaint, he certainly had an opportunity to respond to each charge.

In *McDaniels*, the court held that the *Loudermill* requirements were met when the tenured professor had been told of the nature of the sexual harassment charges, was interviewed by College officials concerning those charges, and had an ample opportunity to supply information to the College between the time he was notified of the charges and his dismissal. 59 F.3d at 456–57. *McDaniels* compels the conclusion that *Loudermill's* pre-termination requirements were met here. See also *Gniotek v. City of Philadelphia*, 808 F.2d 241, 244 (3d Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987) (due process satisfied when discharged employee given notice of charges sufficient to enable him "to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges").

▆▆ Demko insists that summary judgment is not warranted because he "denied [the] allegations" of sexual harassment. (Dkt. Entry 47 at 18.) Whether Demko refuted the charges is not the determinative issue. A court's inquiry is not whether the College made the correct decision, but whether the College afforded Demko the procedural due process that the Constitution guarantees.[8] As the Supreme Court has noted, "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-

---

**8.** The Supreme Court, in *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), noted:

The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitu-

tion cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways.

advised personnel decisions." *Bishop*, 426 U.S. at 350, 96 S.Ct. 2074.

■ Demko also claims a denial of due process because the College refused to give him a post-termination hearing. The *Loudermill* analysis contemplates adequate administrative or judicial post-deprivation procedures.[9] The College asserts that Pennsylvania's Local Agency Law, 2 Pa. Cons.Stat. Ann. §§ 751, *et seq.*, governed the decision to fire Demko and provided adequate procedural protections. Demko disputes the applicability of the Local Agency Law.

The Local Agency Law, in pertinent part, provides:

> No adjudication of a local agency shall be valid as to any party unless they shall have been afforded reasonable notice of a hearing and an opportunity to be heard.

2 Pa. Cons.Stat. Ann § 553. The Local Agency Law further provides a right to judicial review of any local agency "adjudication." *Id.* at § 752.[10] "Adjudication" is defined at 2 Pa. Cons.Stat. Ann. § 101, as:

> Any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made.

Demko asserts that the decision to fire him did not constitute an "adjudication" subject to the procedural safeguards of the Local Agency Law.

9. In *Loudermill*, the Court noted that "[a]lthough the Commission's decision was subject to judicial review in the state courts, Loudermill instead brought the present suit in Federal Court." *Id.* at 536, 105 S.Ct. 1487. The Court further held that "the existence of post-termination procedures is relevant to the scope of pretermination procedures." *Id.* at 547, 105 S.Ct. 1487. The Court concluded that "all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute." *Id.* at 547–48, 105 S.Ct. 1487.

■ Pennsylvania's Supreme Court has considered this issue and found that the removal of a government employee under circumstances that implicate a liberty interest satisfies the definition of a final adjudication even in a situation involving an at-will employee with no property rights in his job. In *Pipkin v. Pennsylvania State Police*, 548 Pa. 1, 693 A.2d 190, 194 n. 3 (1997), the court, differentiating between "property" and "personal" rights, held:

> A personal right or a privilege which will constitute an adjudication pursuant to Section 101 of the Administrative Law and Procedure Act will arise if the party claiming a privilege can establish either some right or privilege created by statute and characterized as such or *some constitutionally protected right or privilege.*

(Emphasis added). *See also Guthrie v. Borough of Wilkinsburg*, 505 Pa. 249, 478 A.2d 1279, 1283 (1984) ("[W]e must also examine whether the action of the Borough intruded upon any personal right, privilege or liberty interest ...."). As noted above, Demko has a constitutionally protected liberty interest in his good name.[11] Accordingly, the College's termination of Demko, coupled with the dissemination of the reasons for Demko's dismissal, constituted an "adjudication" under the Local Agency Law. Consequently, Demko had available to him the procedural rights afforded by that statute.

10. Section 752 provides:
Any person aggrieved by an adjudication of a local agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure).

11. *See Paul v. Davis*, 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), holding that stigmatizing publications can, when coupled with changes in property status, support a cause of action even when there is no underlying right in the property interest.

In *McDaniels,* our Court of Appeals held that the dismissal of a community college professor was an "adjudication" under the Local Agency Law and that the procedural protections provided in that law satisfied the due process clause. 59 F.3d at 460–61. *McDaniels* thus compels rejection of Demko's challenge to the absence of post-termination process.[12]

The fact that Demko was not accorded the hearing required by the Local Agency Law does not entitle him to seek relief under § 1983 for the denial of due process. As *McDaniels* recognized, it is enough if the state offered Demko sufficient process to protect his rights. In this regard, Demko had the right to avail himself of judicial review despite the absence of a hearing conducted by the College. Specifically, 2 Pa. Cons.Stat. Ann. § 754, in pertinent part, provides:

> (A) INCOMPLETE RECORD.—In the event a full and complete record of the proceedings before the local agency was not made, the court may hear the appeal de novo, or may remand the proceedings to the agency for the purpose of making a full and complete record or for further disposition in accordance with the order of the court.

The Pennsylvania courts have held that where the agency fails to accord the aggrieved party an opportunity to be heard, the aggrieved party is entitled to a remand to the agency for a hearing. *See Turner v. Pennsylvania Pub. Util. Comm'n,* 683 A.2d 942, 946–47 (Pa.Commw.1996); *Foster v. Board of Sch. Directors of Keystone Oaks Sch. Dist.,* 678 A.2d 1214 (Pa. Commw.1996). Thus, the availability of state court review of the College's actions, whether or not Demko made use of that review, satisfied the requirements of the due process clause. Because state law accorded Demko due process protections in connection with the termination of his employment, the College's motion for summary judgment must be granted.

12. If Demko had a property interest in his employment, *McDaniels* would also compel

### III. CONCLUSION

Because the enabling legislation that established the College did not contain explicit language that granted the College authority to enter into contracts for a time certain, Demko's one-year contract was void and unenforceable. Although Demko's discharge may have implicated a protected liberty interest, the undisputed facts show that he received an appropriate pre-termination opportunity to be heard, and state law afforded Demko post-termination procedural rights that satisfied the Fourteenth Amendment's due process clause. Because Demko received all the process the Constitution requires, and Demko does not have an enforceable contract, the College's motion for summary judgment will be granted and Demko's motion for summary judgment will be denied.

rejection of his procedural due process claims.