**STATE SYSTEM OF HIGHER EDUCATION, Petitioner**

v.

**ASSOCIATION OF PENNSYLVANIA STATE COLLEGE AND UNIVERSITY FACULTIES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 2003.

Decided Oct. 30, 2003.

Joseph F. Quinn, Pittsburgh, for petitioner.

James L. Cowden, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and COHN, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge PELLEGRINI.

The State System of Higher Education (Employer) appeals from an arbitrator's award finding that it violated its April 8, 1974 "Agreement" with the Association of Pennsylvania State College and University Faculties (Association) when it implemented the chemical biotechnology program without obtaining the approval of the "meet and discuss" committee.

The Association is an employee organization which represents a bargaining unit of faculty members who are employed by Employer. The Association and Employer are both parties to a collective bargaining agreement (CBA) governing the wages, hours and working conditions of the faculty members employed at the 14 state universities in the Commonwealth of Pennsylvania, including East Stroudsburg University (University). In May of 2000, the Association filed several grievances alleging a violation of the CBA when the University unilaterally stopped submitting curriculum changes for approval to the University's curriculum committee, better known as the "meet and discuss" committee, in violation of the parties' April 8, 1974 "Agreement."

The April 8, 1974 "Agreement" was purportedly the result of the Association filing a grievance in 1974 in which it alleged that the University was violating curriculum approval processes by circumventing aca-

demic departments and the curriculum committee. In settlement of the grievance, the parties negotiated what they now refer to as the April 8, 1974 "Agreement."[1] The April 8, 1974 "Agreement" contained an "Institute Agreement" dated February 22, 1974, which provided the following procedure for the approval of all new courses:[2]

7. Approval of all courses offered in the Institute must follow the normal approval procedures:

a. The course must receive approval from the appropriate department.

b. The course will then be submitted to the Academic Council for approval.

c. The course will then be submitted to the Curriculum Committee.

d. The final approval of the course will be given by the President and/or his designee.

Following the approval of the April 8, 1974 "Agreement," over the next 26 years, the University allowed the "meet and discuss" committee to review potential curriculum changes and did not implement any submission not approved by it.

Then, in the year 2000, the University began to develop programs in the areas of science and technology, and a biotechnology program was submitted for approval. While that program was approved by the "meet and discuss" committee, the "meet and discuss" committee raised questions regarding the funding of a related chemical biotechnology program that the University had recently submitted for approval. At that point, the University President, Dr. Robert Dillman, determined that the "meet and discuss" committee did not have the authority to approve program or curriculum changes, and added the chemical biotechnology program to the curriculum without the approval of the "meet and discuss" committee. It was this action by Dr. Dillman that led to the Association's filing of the initial grievance and five subsequent grievances where the "meet and discuss" committee's approval of other curriculum changes was not obtained.[3]

1. In actuality, the 1974 "Agreement" was a memorandum dated April 8, 1974, addressed to all faculty from then-President Darrell Holmes. It contained information regarding summer sessions, the daily time schedule and the status of institutes at the University. At the end of that document, it provides, "The Institute Document follows." "The Institute Document" is dated March 29, 1974, and is a set of statements regarding the formulation of Institutes at the University which include: Institute Agreement dated February 22, 1974; The Institute Budget dated March 29, 1974; Policy Statement dated March 29, 1974; Institute Model dated March 29, 1974; Steps for Course Approval dated March 29, 1974; Program Policy Approval Flow Chart dated March 29, 1974; and Program Approval and Implementation Flow Chart dated March 29, 1974. The statements were agreed to by University President Holmes and the Association.

2. Also included was a document entitled "Steps for Course Approval" dated March 29, 1974, which provided the following procedure:

Step 1. The course must receive approval from the appropriate department.
Step 2. The course will then be submitted to the appropriate Faculty and/or its Council for approval.
Step 3. The course will then be submitted to the Curriculum Committee which in addition to regular course review and approval will resolve possible conflicts as to the departmental assignment.
Step 4. The final approval of the course will be given by the President and/or his designee, after managerial review.

3. Specifically, the Association alleged in its grievances that the University had violated the following sections of the CBA by failing to take proposed curriculum changes to the "meet and discuss" committee which was a long established approval process:

Article 9. Rights and Privileges of [Association]

Because the matter was not resolved during the grievance procedure, the Association filed a demand for arbitration. At the hearing before the arbitrator, the Association presented the testimony of Dr. Leiding who testified that he had been employed by the University from 1968 to 2002, during which time he held several different positions, including being the first chairperson of the "meet and discuss" committee in 1971–1972 and local president of that committee for two years sometime later. He stated that he was familiar with the circumstances involving the negotiations of the April 8, 1974 "Agreement" which were as follows: University President Holmes sought to find an innovative way to bypass the different departments in terms of establishing curriculum changes and he came up with the idea of an Institute and hired a number of managers. As a result, the Association filed a grievance, there were meetings on the grievance, on March 29, 1974, the parties signed an agreement, and on April 8, 1974, the agreement was circulated to the faculty.

A. Meet and Discuss.
1.b. The University President or his/her designees shall meet monthly with a committee appointed by the University chapter of [Association] for the purpose of discussing matters related to the implementation of this agreement.
Article 31.
Miscellaneous Conditions.
F. Past Practice. Rules, regulations, policies or practices relating to wages, hours and terms and conditions of employment now existing and not in conflict with this agreement shall remain in effect unless modified, amended or eliminated in the same manner as they have been adopted. The provisions of this section of this Article shall be subject to the provisions of Article 5, GRIEVANCE PROCEDURE AND ARBITRATION, but only with respect to whether the procedure used to modify, amend or eliminate the rules, regulations, policies or practices was the same as was used to establish the rules, regulations, policies or practices.

Dr. Leiding further testified that the role of the "meet and discuss" committee was "not to look into the what I would say, heart and soul of the courses, but just to make sure all the procedures were covered and all the i's were dotted and all the t's crossed and what have you." (Reproduced Record at 56a.) During the years he was employed, Dr. Leiding stated he could think of no circumstances when the "meet and discuss" committee had not approved a curriculum change. Dr. Leiding also referenced two flow charts that were attached to the April 8, 1974 "Agreement" which indicated that the "Curriculum Committee" was only part of the approval process and only reviewed the proposed program with the President acting as the final decision maker. However, he explained that there were "things missing" from the April 8, 1974 "Agreement" that were "understood" regarding the committee's approval power but were not included.[4]

David Felker also testified on behalf of the Association stating that he worked for

4. More specifically, Dr. Leiding testified:

A. You understand that we have a series of documents here. This is February, then March and then April. And during that time, there was a number of different discussions and meetings going on and saying what's going to settle that. And in the earlier parts, there were things missing, just like I said in the flow chart that was missing. And the president and everybody else understood that program approval was also course approval.
Q. So is it your testimony that this isn't a complete document? Things are missing?
A. I'm saying from the understanding, yes.
Q. So there are steps, it's your testimony that there are steps that were followed that weren't written in this, in this so-called agreement?
A. Dealing with the courses, yes, because—
(Reproduced Record at 80a.)

the University from 1974 to 1998 in various positions including management representative to the "meet and discuss" committee. Regarding the April 8, 1974 "Agreement," he stated that it was his understanding that based upon previous management representatives, curriculum issues would come to the "meet and discuss" committee for approval. When specifically asked what that meant, he stated:

> It meant that the administration would send to [the Association] a list of the programs and/or courses or curriculum issues. They would then put that as an agenda item on meet and discuss at which time they would either be approved or whatever, some discussion would take place.

(Reproduced Record at 39a.) Mr. Felker further testified that during the time he worked for the University, there was dissatisfaction expressed by some presidents and other administrators regarding that process, but that issue never became part of the negotiations of the CBA. He stated that over the 20 years that he was employed by the University, there were probably a couple of thousand of curriculum changes that were approved and, to his knowledge, none were ever denied.

Robert Dillman, President of the University, testified on behalf of Employer stating that he had been President of the University for six years. President Dillman stated that he was familiar with the grievance regarding the chemical biotechnology program, but that it was not within the purview of the "meet and discuss" committee to condition approval of the program upon a request for additional funds and that he could not recall the

committee conditioning approval for curriculum changes in the past. He also stated that there was no requirement that the committee approve changes in courses and programs because it only had a "review" function. President Dillman testified that after seeking advice from labor relations personnel, he implemented the chemical biotechnology program.

Also testifying on behalf of Employer was Thomas Krapsho, who stated that he had worked for five years as the Director of Labor Relations for Employer and was familiar with the CBA which was in place prior to his assuming that position. Mr. Krapsho testified that when Employer approached him regarding the budget concerns the "meet and discuss" committee had with the chemical biotechnology program, he stated:

> I advised the university after conversations with other individuals within the Office of the Chancellor that it was our opinion that the curriculum decisions were managerial prerogatives and that meet and discuss meant meet and discuss, because the reference to the meet and discuss provisions in the contract as it is defined in the statute wherein the final agreement on issues subject to meet and discuss rests with the employer.

(Reproduced Record at 147a.)

After the hearing, the arbitrator issued an opinion and award in favor of the Association finding that Employer violated the April 8, 1974 "Agreement" when it implemented the chemical biotechnology program without obtaining the approval of the "meet and discuss" committee.[5] The

---

5. In his award, the arbitrator actually stated that Employer had violated the April 8, 1974 "Agreement" when it implemented the chemical biotechnology program without obtaining the approval of the "curriculum committee."

After the issuance of that award, the Association wrote the arbitrator requesting him to clarify his prior order by changing the words "curriculum committee" to "meet and discuss" committee. By letter dated May 15,

arbitrator relied on the testimony of Dr. Leiding and Mr. Felker which he found established that the parties recognized the applicability of the April 8, 1974 "Agreement" during the tenure of five University presidents over 25 years and the need to obtain the approval of the "meet and discuss" committee before course and/or program changes could be made. The arbitrator directed Employer to cease and desist from such action in the future. This appeal by Employer followed.

 The law is well-settled that our scope of review of a grievance arbitration award is the essence test. *State System of Higher Education (Cheyney University) v. State College & University Professional Association*, 560 Pa. 135, 743 A.2d 405 (1999). Under this test, a reviewing court shall first determine if the issue is within the terms of the collective bargaining agreement. *Id.* If it is, the arbitrator's award will be upheld if the arbitrator's interpretation can be rationally derived from the collective bargaining agreement. *Id.* A court will only vacate an arbitrator's award where the award is genuinely without foundation in or fails to logically flow from the collective bargaining agreement. *Id.*

Employer contends that the arbitrator erred under both prongs of the test because the matter was not within the terms of the CBA and was not properly before him for review. More specifically, Employer argues that the University's curriculum is a matter of inherent managerial policy which is not subject to collective bargaining and is not an issue contained in the CBA. We agree.

█ Section 701 of the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.701, only requires a public employer to negotiate over "wages, hours, and other terms and conditions of employment." Section 702 of PERA, 43 P.S. § 1101.702, provides that a public employer shall not be required to collectively bargain over matters of inherent managerial policy *which shall include* but shall not be limited to such areas of discretion or policy as the functions and *programs of the public employer.* *See also Curley v. Board of School Directors of the Greater Johnstown School District*, 163 Pa. Cmwlth. 648, 641 A.2d 719, 726 (1994), where we held that "[u]nder the PERA, 'meet and discuss' sessions exist as a device to permit input or recommendations from first-level supervisors on policy matters affecting wages, hours and terms and conditions of employment so as to assist the public employer in ultimately making its disposition of the issues in question." Further, Section 301(17) of PERA, 43 P.S. § 1101.301, defines "meet and discuss" in such a way that the public employer retains exclusive managerial authority when making decisions. That section states:

"**Meet and discuss**" means the obligation of a public employer upon request to meet at reasonable times and discuss recommendations submitted by representatives of public employes; Provided, That any decisions or determinations on matters so discussed *shall remain with the public employer and be deemed final on any issue or issues raised.* (Emphasis added.)

---

2003, the arbitrator stated that he was changing his award to read as requested and explained that he attributed the error to his "incorrect use of the autotext feature of my new word processing technology ... There is no need for a 'clarification' of my Opinion and Award. There is a need for the correc-

tion of an autotext error, which in the 'old days' would have been properly referred to as a typographical error. A plain reading of the decision and of the issue joined below establishes that the parties disputed the authority of the meet and discuss committee to approve a curriculum change."

Clearly, under PERA, the University's managerial policy of approving curriculums or making any other program-related decision is not subject to collective bargaining and the University maintains a managerial prerogative of making curriculum changes without the "meet and discuss" committee's approval.

Moreover, nowhere in the CBA is the "meet and discuss" committee mentioned in the capacity that is under scrutiny. The only place in the CBA where "meet and discuss" is mentioned is under Article 9(A)(1.)(a) and (b), RIGHTS AND PRIVILEGES OF APSCUF, which provide that the Chancellor and the University President or his/her designee "shall meet monthly with a committee appointed by the Association for the purpose of discussing matters related to the implementation of this "Agreement"." This " "Agreement" " refers to the CBA which only deals with the terms and conditions of employment of University employees, not the employees' actual job duties. As would be expected, nothing in Article 9 remotely mentions the "meet and discuss" committee's duties and/or authority over curriculum matters.

The Association, however, argues that the University has waived these arguments because the arbitrator found that the April 8, 1974 "Agreement" was a grievance settlement and is to be read as part of the CBA. It relies on *United Mine Workers of America v. Barnes and Tucker Co.*, 561 F.2d 1093, 1096 (3d. Cir.1977), which held that "where a collective bargaining agreement designates settlement agreements as being final and binding, the fact that a settled grievance does not proceed to arbitration does not preclude judicial enforcement of that settlement agreement." The Association points out that the definition of "curriculum committee" is found in the CBA but not in the April 8,

1974 "Agreement." Because the arbitrator found that the April 8, 1974 "Agreement" was in full force and effect at the time the University implemented the chemical biotechnology program without the approval of the "meet and discuss" committee, the Association argues that the University violated the terms of the CBA.

■ While the arbitrator may have found that the April 8, 1974 "Agreement" was the result of a grievance that was filed, there is nothing in the record to substantiate that a grievance was actually filed other than Dr. Leiding's testimony. However, even if we were to agree that a grievance was filed and the April 8, 1974 "Agreement" was the result of that grievance, that document did not give away any of the University's managerial rights. Rather, the documents attached to the April 8, 1974 "Agreement" specify the decision making process for curriculum changes giving the University the decision making power. In every relevant document—the Institute "Agreement", the Steps for Course Approval, and the flow charts, the University President is the individual that has the final decision making power. Nowhere in any of those documents is the "meet and discuss" committee given any authority to do anything more than review proposed changes and resolve possible conflicts. Certainly, they are not given the authority to approve curriculum changes. The arbitrator's crediting of Dr. Leiding's testimony that the flow charts—which give the President the final decision making authority—omitted "things" which gave the "meet and discuss" committee the authority to approve curriculum changes is an amendment and not an interpretation of the "Agreement" and does not derive itself from the essence of the "Agreement" because what the arbitrator was doing was amending its plain written meaning approximately 30 years later.

 The Association then argues that even if the April 8, 1974 "Agreement" did not give away the University's managerial rights, the past practice of the University was to give the "meet and discuss" committee the authority to approve curriculum changes. First, just because an employer and union engage in constructive dialogue and work out problems over the years with a meet and discuss committee or a meet and discuss unit does not create a "past practice" whereby the employer will never disagree with the recommendations of that meet and discuss committee or unit or, for that matter, create a past practice whereby the union will always approve a management proposal. Second, a past practice is not binding on a public employer unless that practice is subject to mandatory bargaining under a collective bargaining agreement.[6] In this case, whether the "meet and discuss" committee had the authority to approve curriculum changes was never included in the CBA and never was the subject of the CBA. Therefore, the "meet and discuss" committee's past practice was not subject to mandatory bargaining under the CBA and has no binding effect on the present action of the University.

Accordingly, because the arbitrator erred by finding that the issue of the "meet and discuss" committee's authority over curriculum changes was within the terms of the CBA, his decision and award must be vacated.

***ORDER***

AND NOW, this 30th day of October, 2003, the arbitrator's award dated December 23, 2002 and its clarification order dated May 15, 2003 are vacated.

Senior Judge JIULIANTE dissents.

---

**6.** In *South Park Township Police Association v. Labor Relations Board,* 789 A.2d 874 (Pa. Cmwlth.2002), *petition for allowance of appeal denied,* 569 Pa. 727, 806 A.2d 864 (2002), a case dealing with an allegation of an unfair labor practice in violation of PERA and what is commonly referred to as Act 111, Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10, where we found that a past practice did not take away managerial prerogative, we stated:

To conclude that an employer must bargain collectively with a bargaining unit over something that may constitute a past practice but is not a mandatory subject of collective bargaining would bind an employer to virtually all practices including matters of managerial prerogative extant at the time of negotiating a collective bargaining agreement and arbitrarily expand the parameters of Act 111.

The same rationale applies here.