Abington Heights School District,     :
                  Petitioner     :
                           :
                           :    No. 404 C.D. 2021
          v.                 :
                           :    Argued: September 20, 2021
Pennsylvania Labor Relations Board,    :
                  Respondent    :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


### *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                          FILED: February 10, 2022


       Abington Heights School District (District) petitions for review of the March 19, 2021 final order of the Pennsylvania Labor Relations Board (PLRB) that dismissed the District's exceptions to the hearing examiner's proposed decision and order (PDO), which concluded that the District violated section 1201(a)(1) and (5) of the Public Employe Relations Act (PERA),[1] by unilaterally transferring the bargaining unit work of instructing high school students to employees of Johnson College

---

[1] Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §1101.1201(a)(1), (5). Section 1201 of PERA generally lists the bases for unfair labor practices and, relevant here, states that "[p]ublic employers, their agents[,] or representatives are prohibited from," *inter alia*, "(1) [i]nterfering, restraining[,] or coercing employes in the exercise of the rights guaranteed in Article IV of this act," which pertains to public employees' basic rights to unionize and engage in collective bargaining, *see* section 401 of PERA, 43 P.S. §1101.401, and from "(5) [r]efusing to bargain collectively [and] in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit." 43 P.S. §1101.1201(a)(1), (5).

(College) without first bargaining with Abington Heights Education Association (Association), the certified bargaining representative of the District's teachers. On three separate and independent grounds, we reverse.

The gist of this matter concerns an agreement (Agreement) between the District and the College pursuant to section 1525 of the Public School Code of 1949 (School Code),[2] 24 P.S. §15-1525,[3] commonly known as a "dual enrollment program," whereby students of the District could attend the College, take courses that are offered at the College, and receive high school credits and also credits at the College (if the student later attends the College) upon successful completion of the College's courses. The major issue on appeal is whether the District's decision to enter into the Agreement was an exercise of its "inherent managerial prerogative" to create and dictate its academic curriculum or whether the Agreement concerned matters that would require the District to engage in collective bargaining with the Association prior to entering into the Agreement. Put simply, if the District's decision was the former, the District did not violate PERA; if it was the latter, the District committed unfair labor practices under PERA. *See Association of Pennsylvania State College and University Faculties*

---

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§1-101 to 27-2702.

[3] This provision states as follows:

> Notwithstanding any other provision of law to the contrary, a school district may enter into an agreement with one or more institutions of higher education approved to operate in this Commonwealth in order to allow resident students to attend such institutions of higher education while the resident students are enrolled in the school district. The agreement may be structured so that high school students may receive credits toward completion of courses at the school district and at institutions of higher education approved to operate in this Commonwealth.

24 P.S. §15-1525.

2

*v. Pennsylvania Labor Relations Board*, 226 A.3d 1229, 1241-44 (Pa. 2020); *City of Harrisburg v. Pennsylvania Labor Relations Board*, 605 A.2d 440, 442 (Pa. Cmwlth. 1992).[4]

## Background

The PLRB summarized the pertinent facts of this case as follows:

The Association is the certified bargaining representative of a unit of professional employees including teachers. For at least 37 years, the teachers have exclusively performed work related to the education, instruction, and teaching of the District's students. This work includes the presentation of academic material, impartment of knowledge and concepts, evaluation of academic progress, assessment and testing of student performance or grading, counseling, and providing any other guidance, supervision, or support necessary to ensure academic success. The courses that appear in the District's High School Curriculum Planning Guide and in the District's high school class schedules have always been taught exclusively by the bargaining unit teachers.

. . . .

In the past, the District offered dual enrollment courses where its students attended the University of Scranton, took college level courses, and received college credit. **The dual enrollment program was offered pursuant to Act 46 of the [] School Code[5] [] on a "Concurrent Enrollment Agreement" between the District and the University of Scranton funded by a state grant**. **The students did not receive credit toward their high school graduation, and the dual enrollment courses did not replace the high**

---

[4] "[A] public employer commits an unfair labor practice when it unilaterally transfers *any* unit work to non-members without first bargaining with the unit." *City of Harrisburg*, 605 A.2d at 442 (emphasis in original).

[5] Act of July 13, 2005, P.L. 226. Act 46 added Article XVI-B, "Opportunities for Educational Excellence," to the School Code, 24 P.S. §§16-1601-B-1615-B.

**school classes taught by the bargaining unit teachers**. **The students were required to take their full course load of high school instruction from classes taught by bargaining unit teachers**. **The dual enrollment courses were taught outside the normal school day**. However, as of February 2012, the state funding for the dual enrollment program was completely eliminated and it was uncertain whether the District would offer the same dual enrollment courses at the University of Scranton in the future.

For the past three years, the District had another dual enrollment program with Lackawanna College **where high school students [would] take classes and receive credit for high school and postsecondary education**. **The classes are taught by bargaining unit teachers at the District's high school during the regular school day**.

On May 15, 2019, Thomas Lavelle, the Association['s] President, received an email from [District] Superintendent Michael Mahon, requesting that Mr. Lavelle review a draft "Industry Fast Track Agreement," [*i.e.*, the Agreement,] between the District and [the] College and to communicate any concerns about the Agreement. The District's School Board was scheduled to approve the Agreement the same evening. Mr. Lavelle contacted Superintendent Mahon and stated that the Agreement was a removal of bargaining unit work [from the teachers]. Despite the Association's concerns, Superintendent Mahon presented the Agreement to the School Board, which approved it.

[The] College is a two-year college that offers postsecondary or collegiate education to people who have graduated from high school. **The [Agreement]**, effective July 1, 2019, to June 30, 2022, **states that [the] College would offer its courses to the District's high school students**. **The Agreement also provides that the District would award high school credit to students who successfully complete [the] College courses. The same courses are used for collegiate credit if the students attend [the] College after high school**.

The Agreement requires the students to be enrolled in the District's high school and complete [the] College courses as

4

a high school student. The Agreement also requires the students to make satisfactory progress toward fulfilling applicable secondary school graduation requirements by the high school. The Agreement lists 18 classes that [the] College would provide to the District's high school students. Many of the classes are in vocational trades, such as construction, electricity, and pipefitting, while other classes are in core academic areas such as math and English. **The classes listed in the Agreement address areas of instruction that are taught by the bargaining unit teachers at the high school, including math, English, and vocational technical trades. The Agreement provides that the classes will be taught by the faculty and/or employees of [the] College and held on the College campus**.

The District did not obtain grant money or funding in connection with the Agreement. Instead, the District pays [the] College directly for the classes and has been given $35,000[.00] from a local charitable foundation to help pay for the cost of the program. The District did not submit the Agreement to the Pennsylvania Department of Education [(PDE)] for approval[,] nor is there evidence that the [PDE] approved the Agreement.

Since July 1, 2019, eight high school students have taken classes at [the] College pursuant to the Agreement. **The classes are being taught by the faculty at [the] College and appear on the students' high school report cards counting towards the students' high school education requirements. The District did not bargain with the Association over the use of [the] College employees to teach [the] classes**.

. . . **The students** who attend [the] College . . . stay at the District's high school for full days until their senior year. The students then **attend [the] College during their senior year for half days**. **The students who attend [the] College spend the other half of the day taking classes at the District's high school**.

Since the implementation of the Agreement, the District has paid [the] College to provide Business Education classes to

the District's high school students, which is not one of the listed courses in the Agreement. Two bargaining unit high school teachers instruct in the area of Business Education and that course appears in the District's High School Curriculum [Planning] Guide.

(PLRB's decision at 1-3) (footnotes omitted, emphasis added).

On September 13, 2019, the Association filed its charge of unfair labor practices, alleging that the District violated section 1201(a)(1) and (5) of PERA by transferring the bargaining unit work of instructing certain high school courses to the employees of the College. Thereafter, the PLRB scheduled—and a hearing examiner held—a hearing on February 10, 2020, during which all parties in interest were afforded the basic rights of due process regarding argumentation and the presentation and contestation of evidence. In the PDO, the hearing examiner concluded that the Association met its burden of proof as to its alleged charge and recommended various remedies to rectify the District's violations of PERA.

The District filed exceptions to the PDO to the PLRB. In addition to advancing other arguments, the District cited a decision from the PLRB, *Palisades v. Education Association v. Palisades School District*, 37 PPER 168 (Final Order, 2006), 2006 PA PED LEXIS 44 (*Palisades*), and contended that the hearing examiner failed to properly apply the legal reasoning espoused therein. In dismissing this assertion, the PLRB stated as follows:

> Under Act 46, a school district can enter into a concurrent or dual enrollment agreement with a postsecondary institution and apply for grant funds from the [PDE]. [Sections 1603-B(c) and 1611-B(c) of the School Code,] 24 P.S. §§16-1603-B(c), 16-1611-B(c). **In [*Palisades*], the [PLRB] concluded that the manner in which a dual enrollment course is implemented under Act 46, including the selection of the teacher, is controlled by the postsecondary institution**

6

**providing the course and not the school district.**[6]  **As such, the [PLRB] held that the school district in that case did not violate its duty to bargain when a non-bargaining unit professor of the postsecondary school taught courses to high school students for secondary and postsecondary credit**.

Here, the uncontested findings of fact show that the District did not submit its Agreement with [the] College to PDE for approval, nor has it obtained grant money from PDE for its program with [the] College.  Instead, the District is paying for its high school students to attend the courses at [the] College.  Further, the District is not unaware of the requirements under Act 46 as it has previously obtained grant funding from PDE for its dual enrollment program with Scranton University. . . . Based on the facts presented, the [h]earing [e]xaminer did not err in concluding that the District's dual enrollment program with [the] College was not pursuant to Act 46.  Therefore, the [PLRB's] decision in [*Palisades*] is inapplicable.

(PLRB's decision at 6-7) (emphasis added).

In rejecting the District's argument that it had the authority under section 1525 of the School Code to enter a dual enrollment program with the College, and the hearing examiner's decision effectively prohibited the District from doing so, the PLRB reasoned as follows:

Pursuant to section 1611-B(f) of the [] School Code, a school district is not precluded from entering into a dual enrollment

---

[6] *See* section 1604-B(a) and (b) of the School Code, 24 P.S. §16-1604-B(a) ("A member of an eligible postsecondary institution's faculty who teaches a concurrent course under [Act 46] shall not be an employee of a school entity, an independent contractor of a school entity or an employee of an independent contractor of a school entity . . . unless the faculty member teaches a course in a school entity's building."), *and compare with* 24 P.S. §16-1604-B(b) ("**Nothing in [Act 46] shall be construed to prohibit an eligible postsecondary institution from contracting with a professional employee of a school entity for purposes of a concurrent enrollment program if the professional employee meets all qualifications for an adjunct faculty member at the eligible postsecondary institution**.") (emphasis added).

program under section 1525 if it is unable to receive Act 46 grant funding.[7]

. . . . As stated by the [h]earing [e]xaminer, the provisions of Act 46 do not apply to dual enrollment programs created under section 1525. Further, **unlike Act 46, section 1525 does not vest control over the implementation of and selection of the instructor for a dual enrollment course in the postsecondary institution**. Contrary to the District's assertion, **the [h]earing [e]xaminer's decision merely holds that the District must bargain with the Association over the assignment of teaching dual enrollment courses for high school credit and does not prevent the District from creating a dual enrollment program under this provision**.

. . . . [T]he [h]earing [e]xaminer did not err in concluding that **the District violated section 1201(a)(1) and (5) of PERA by unilaterally (1) transferring the bargaining unit work of teaching English and Business Education courses to the employees of [the] College and (2) changing the extent to which non-bargaining unit employees taught building trade courses to the District's high school students**. Accordingly, the [PLRB] shall dismiss the [District's] exception[s]. . . .

(PLRB's decision at 7-8) (emphasis added).

For relief, the PLRB ordered the District to cease and desist from violating PERA and from refusing to bargain collectively and in good faith with the Association, the exclusive bargaining representative of the teachers. In terms of affirmative action, the PLRB ordered the District to return the teaching work to the Association's teachers, rescind the Agreement with the College, and make whole any bargaining unit

---

[7] Section 1611-B(f) of the School Code states: "Nothing in this article shall be construed to preclude a school entity that does not receive a grant under section 1603-B(c) from continuing or entering into an agreement with an institution of higher education under the provisions of section 1525." 24 P.S. §16-1611-B(f).

employees who have been adversely affected due to the District's unfair labor practices, together with 6% per annum interest.

Subsequently, the District filed a petition for review in this Court.[8]

**Discussion**

In its brief, the District argues that the PLRB erred as a matter of law by infringing upon the District's inherent managerial prerogative to determine the manner and level of educational services it provides to its students by imposing a requirement that the District negotiate with the Association before entering into an agreement with the College pursuant to section 1525 of the School Code. In contending that the PLRB misconstrued section 1525, the District notes that the plain language of that statutory provision does not impose upon it an obligation to bargain collectively and maintains that such a requirement would run counter to and defeat the purpose of the statute, namely to provide high school students with the opportunity to take college-level courses and potentially obtain college credits.

Countering, the PLRB argues:

> [I]t is undisputed that the District unilaterally transferred the bargaining unit work of teaching English, Business Education, and building trades courses for high school credit to the employees of [the] College during the 2019-2020 school year without bargaining with the Association. Contrary to the District's assertion, its managerial right to decide what courses to provide its high school students does not trump its duty under section 701 of PERA[, 43 P.S. §1101.701,] to bargain with the Association concerning who will teach those courses.

---

[8] Our standard of review of a decision of the PLRB "is limited to determining whether there has been a violation of constitutional rights, an error of law, [or] procedural irregularity, or whether the findings of the agency are supported by substantial evidence." *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 998 A.2d 589, 594 (Pa. 2010).

9

As consistently held by the Pennsylvania Supreme Court over the past 45 years, items that are bargainable under section 701 are only excluded from bargaining where other applicable statutory provisions *explicitly* and *definitively* prohibit the public employer from making an agreement as to that specific item. Section 1525 of the [] School Code does not explicitly or definitively prohibit the District from bargaining over who will teach dual enrollment courses, nor does it vest control over selection of the instructor for a dual enrollment course in the postsecondary institution.

(PLRB's Br. at 10) (emphasis in original).

The Association, as intervenor, posits that the PLRB's decision does not impair the District's managerial rights because the PLRB did not prohibit the District from establishing a dual enrollment program under section 1525 of the School Code. According to the Association, the "District, instead, must use the Association's bargaining unit members to perform the work of the [d]ual [e]nrollment program [] and cannot divert the work to outsiders without [first] negotiating the issue with the Association." (Association's Br. at 15.)

In assessing whether an employment matter must go through collective bargaining, our Supreme Court discussed the interplay between sections 701, 702, and 703 of PERA, 43 P.S. §§1101.701, .702, .703, respectively,[9] explaining that

---

[9] Section 701 provides as follows:

Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

43 P.S. §1101.701.

**(Footnote continued on next page…)**

as a general matter, public entities subjected to PERA make a variety of decisions in fulfilling their mission. Certain of these decisions relate to the formulation and implementation of policies. Other decisions go to the relationship between the public entities and the individuals that they employ. With respect to these decisions, [] certain topics under PERA are considered to be mandatory subjects of bargaining, others are considered to be permissive or voluntary subjects of bargaining, and, finally, certain matters are not permitted to be bargained at all, as they are deemed to be illegal subjects of bargaining.

*Association of Pennsylvania State College*, 226 A.3d at 1241.

------

Section 702 states as follows:

Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

43 P.S. §1101.702.

Finally, section 703 declares as follows:

The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters.

43 P.S. §1101.703.

11

Initially, under section 701 of PERA, "**public employers must collectively bargain** with employee representatives **over wages, hours, and other terms and conditions of employment**." *Association of Pennsylvania State College*, 226 A.3d at 1241 (emphasis added). However, "it is equally apparent that the General Assembly had no intention or expectation that the collective bargaining process would permit public employees to set matters of public policy or participate with their public employer in administering the public enterprise." *Id.* at 1242. "The right to collective bargaining as to 'wages, hours and other terms and conditions of employment' is not unlimited, as [s]ection 702 [of PERA] unambiguously provides that a public employer is not required to bargain if the topic is one of inherent managerial policy." *Id.* "Thus, pursuant to [s]ection 702, a **public employer is not required to collectively bargain** over **matters of 'inherent managerial policy'—also referred to as managerial prerogatives—as these matters are reserved for the employer's unilateral decision-making**." *Id.* (emphasis added). "By [s]ection 702, the General Assembly has broadly indicated what it deems to be examples of inherently managerial matters, identifying programming, standards of service, budgetary matters, organizational structure, and the selection and direction of personnel." *Id.* "Finally, [s]ection 703 expressly provides that the **parties may not bargain over, and a collective bargaining agreement [CBA] may not contravene, any legislative mandate**." *Id.* (emphasis added).

Quoting and elaborating upon *Pennsylvania Labor Relations Board v. State College Area School District*, 337 A.2d 262 (Pa. 1975) (*State College II*), our Supreme Court in *Association of Pennsylvania State College* explained:

> As to the process by which the [PLRB] and the courts are to determine and reconcile which matters are subject to collective bargaining and which topics are deemed to be

12

inherent managerial policies under PERA, our landmark 1975 decision in *State College* [*II*] has provided guidance for over 40 years. Writing for the Court, Justice Robert N.C. Nix, Jr.[,] addressed the determination of whether a particular topic is a matter of wages, hours, or working conditions subject to bargaining under section 701, or an inherent managerial policy of the public employer, and not subject to mandatory bargaining, under section 702. In determining which matters were bargainable, our Court first recognized the balance between the public employer's significant role in providing effective and efficient public services and the importance of a viable process of collective bargaining to reduce labor strife. Specifically, we noted[:]

> **A determination of the interrelationship between sections 701 and 702 calls upon us to strike a balance wherein those matters relating directly to 'wages, hours and other terms and conditions of employment' are made mandatory subjects of bargaining and reserving to management those areas that the public sector necessarily requires to be managerial functions**.

*State College* [*II*], 337 A.2d at 267-68.

We recognized that in "striking this balance the paramount concern must be the public interest in providing for the effective and efficient performance of the public service in question." *Id.* at 268. Indeed, appreciating the difficulty of the task, the Court stressed that "[w]e recognize that in many instances the line will be difficult to draw,[] however, if we remain ever mindful that our paramount concern in this area is the public interest, no situation will be insoluble." *Id.* (footnote omitted). In focusing on the balancing inquiry, the *State College* [*II*] Court recognized the reality that some matters which are of prime concern to employees' wages, hours, or terms and conditions of employment may, at the same time, directly implicate, or at least touch upon, basic public employer policy. Indeed, an employer's policy decisions almost invariably implicate, to some degree, the employer-employee relationship.

13

With its primary focus on the public interest, the Court went on to offer a test, to be applied on a case-by-case basis, weighing a given matter's impact on the interest of the employee against the effect on the employer's basic policy determinations:

> [W]e hold that where an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours[,] and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy. It is the duty of the [PLRB] in the first instance and the courts thereafter to determine whether the impact of the issue on the interest of the employe in wages, hours[,] and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole.

*Id.*

Thus, in determining whether a topic is subject to collective bargaining, the [PLRB] in the first instance, and then **the courts**, **must consider the relative weight of the impacted interest of the public employee in wages, hours, and conditions of employment against the public employer's impacted interest in basic policy matters concerning the employer's operations, and then assess which interest predominates. If the impact on the employees' interest in wages, hours, and conditions of employment outweighs the employer's concerns about restrictions on its basic policy choices, the proposal is considered a mandatory subject of bargaining. If, however, the latter outweighs the former, such topic shall be deemed to constitute an inherent managerial prerogative and be insulated from the give-and-take of mandatory collective bargaining**. . . .

*Association of Pennsylvania State College*, 226 A.3d at 1242-44 (emphasis added). In all events, in conducting the balancing test mentioned above, this Court must remain

"[m]indful **that the paramount concern in th[e] inquiry is the public interest**." *Id.* at 1245 (emphasis added).

### Section 702 of PERA—The Inherent Managerial Prerogative of the District and the Public Interest Involved in Educational Policy

First, we determine the significance of—and the nature of the public interest in—the District's policy-based choices, which will aid in deciding "whether a particular subject represents a question of 'educational policy' or whether it is a 'condition of employment.'" *United Teachers of Dade v. Dade County School Board*, 500 So.2d 508, 513 (Fla. 1986). Ultimately, if a subject matter relating to employment constitutes and falls into the category of the District's "educational policy," it will be deemed to be an inherent managerial prerogative of the District and, thus, not subject to collective bargaining.

In *Pennsylvania Labor Relations Board v. State College Area School District*, 306 A.2d 404 (Pa. Cmwlth. 1973) (*State College I*), *remanded on other grounds by State College II*, this Court discussed the fundamental and strong public interest in public education:

> [A] school district is an agency of the State, created by law for the purpose of promoting education, deriving all of its powers from the statute, and discharging only such duties as are imposed upon it by statute. The school district is an agency of the State charged with the sovereign duty of building and maintaining the schools within its particular territory and with the further duty of securing, managing, and spending the necessary funds in the interest of public education[.] . . . Article 3, [s]ection 14 of our present Pennsylvania Constitution provides that "[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."[10] The school districts are

---

[10] Pa Const. art. III, §14.

15

agencies of the Legislature to administer this constitutional duty. The [] School Code [] . . . contains section 211, 24 P.S. §2-211, which provides that "[t]he several school districts in this Commonwealth shall be, and hereby are vested as, bodies corporate, with all necessary powers to enable them to carry out the provisions of [the School Code]." Thus[,] we must conclude that school boards have traditionally been given by the Legislature, under constitutional mandates, broad inherent managerial powers to operate the public schools and to determine policy relative thereto.

*State College I*, 306 A.2d at 410.

Reproducing phrases in the case law from our Supreme Court and this Court, the *State College I* court further added that "[t]he fundamental policy of our public school system is to obtain the best educational facilities for the children of the Commonwealth. . . . The duty of devising methods by which this important obligation can be discharged devolves upon the school boards"; "**[s]chool authorities must be given broad discretionary powers to ensure a better education for the children of this Commonwealth** and any restrictions on the exercise of these powers must be strictly construed on the basis that the public interest predominates and private interests are subordinate thereto"; "[b]y the School Code, the school directors are given [the] power to administer the public school system; they are commanded . . . to conduct school affairs and keep the schools open"; and, "**[i]t is the administrative function of the school directors and superintendents to meet changing educational conditions through the creation of new courses . . . and [the] rearrangement of curriculum**." *Id.* at 411-12 (internal citations and quotation marks omitted; emphasis added).

In *State System of Higher Education v. Association of Pennsylvania State College University Faculties*, 834 A.2d 1235 (Pa. Cmwlth. 2003), a public university appealed an arbitrator's award finding that it violated a purported "agreement" with a bargaining unit when the public university instituted a university chemical

16

biotechnology program without first obtaining the approval of a "meet and discuss" committee created by the "agreement." On appeal, the public university argued that its decision regarding its academic curriculum was a matter of inherent managerial policy, which was not subject to collective bargaining and, further, was not a requirement—let alone an issue that was contained—in the CBA. This Court agreed with both arguments. First, we determined that the issue of the "meet and discuss" committee's authority over curriculum changes was not within the scope of a provision in the CBA; thus, the arbitrator erred in finding that the public university violated either an "agreement" with the bargaining unit or the terms of the CBA. Second, and most importantly, this Court relied on section 702 of PERA and concluded as follows: "**Clearly, under PERA, the [u]niversity's managerial policy of approving curriculums** or making any other program-related decision **is not subject to collective bargaining and the [u]niversity maintains a managerial prerogative of making curriculum changes** without the 'meet and discuss' committee's approval." 834 A.2d at 1241 (emphasis added).

Notably, other courts have echoed the underlying sentiment espoused by this Court in *State System of Higher Education*, expressing the general view that a school board's determination regarding the nature of its academic curriculum represents a choice that is related to educational policy and, thus, constitutes a managerial prerogative of a school board. *See Higher Education Coordinating Council/Roxbury Community College v. Massachusetts Teachers' Association/ Massachusetts Community College Council*, 666 N.E.2d 479, 484 (Mass. 1996) ("As a matter of policy and legislative directive, the college, through its board of trustees and school administrators, should retain sole authority for determining the content of its educational curriculum, and the optimum system for the delivery of the academic

17

programs and related services it deems necessary."); *Dunellen Board of Education v. Dunellen Education Association*, 311 A.2d 737, 741 (N.J. 1973) ("Illustratively, [a] court expressed the view that matters such as the following would fall exclusively within management's prerogatives and would not be the subject of compulsory negotiation: The right . . . to determine the curriculum, class size, and types of specialists to be employed."); *Joint School District No. 8 v. Wisconsin Employment Relations Board*, 155 N.W.2d 78, 82-83 (Wisc. 1967) ("The contents of the curriculum [and] [s]ubjects of study are within the scope of basic educational policy and additionally are not related to wages, hours and conditions of employment."); *see also Palisades*, 37 PPER at 168, 2006 PA PED LEXIS 44, at *3 ("As an initial matter, the [u]nion does not challenge the [d]istrict's managerial prerogative to determine the manner and level of educational services by making available concurrent enrollment, dual credit courses for its students."); *id.*, at *5 (stating that a "[school] district exercises its managerial prerogative to make available a concurrent enrollment, dual credit course").

Turning to the relevant statutory provision in this case, section 1525 of the School Code states as follows:

> Notwithstanding any other provision of law to the contrary, **a school district may enter into an agreement with** one or more **institutions of higher education** approved to operate in this Commonwealth in order **to allow resident students to attend such institutions of higher education** while the resident students are enrolled in the school district. The agreement may be structured so that **high school students may receive credits toward completion of courses at the school district <u>and</u> at institutions of higher education approved to operate in this Commonwealth**.

24 P.S. §15-1525 (double emphasis added).

18

Therefore, based on the above, we conclude that there is a compelling and strong public interest in the District's educational policy and its choices regarding the nature of its academic curriculum. We further conclude that, through the General Assembly's directive in section 1525 of the School Code, the District possesses the statutory authority to enter into agreements with postsecondary schools, such as its Agreement with the College, and that its decision to do so is directly related to the District's educational policy and, thus, constitutes a matter that falls within its inherent managerial prerogative. On this basis, we conclude that the District did not violate PERA, and that the PLRB erred in deciding to the contrary.

### Section 703 of PERA—Collective Bargaining and/or a CBA that Contravenes and/or is Inconsistent with a Statutory Mandate

Second, we assume, for the sake of the argument, that the Agreement concerns a matter or topic that is exclusively an item that must undergo the collective bargaining process under section 701 of PERA, because it concerns the "wages, hours, and other terms and conditions of employment," and has absolutely no bearing or relationship to the District's managerial prerogative. We further assume, *arguendo*, that the impact that the Agreement has on the interest of the Association's relevant teachers in their wages, hours, and conditions of employment substantially outweighs any interest that the District has pertaining to a managerial prerogative and, as such, must be subjected to collective bargaining.

Nonetheless, even if either event or circumstance (or both) were true, "[s]ection 703 expressly provides that the parties may not bargain over, and a collective bargaining agreement may not contravene, any legislative mandate." *Association of Pennsylvania State College*, 226 A.3d at 1242. Per the terms of section 703, there is a "contravention" when such collective bargaining or a CBA "would be in violation of,

19

or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania." 43 P.S. §1101.703.

On this note, it is extremely significant that section 1525 of the School Code, reproduced above, is prefaced with the phrase, "[n]otwithstanding any other provision of law to the contrary." 24 P.S. §15-1525. According to our Supreme Court, a clause of this nature is decimating in the sense that it constitutes a clear and unequivocal expression by our General Assembly that the statutory section supersedes and completely displaces any and/or all laws that state, or could be interpreted to state, a contrary proposition of law. *See, e.g.*, *City of Philadelphia v. Clement & Muller, Inc.*, 715 A.2d 397, 398 (Pa. 1998) (interpreting the phrase, "[n]otwithstanding a contrary provision of law of the Commonwealth," the Court concluded that "[t]he meaning of the emphasized introductory language is straightforward: regardless of what any other law provides, [the governmental entity is] authorized by th[e] act to [do precisely that]"); *accord City of Johnstown v. Workers' Compensation Appeal Board (Sevanick)*, 255 A.3d 214, 222 (Pa. 2021) ("This Court understands the use of 'notwithstanding' to be an unambiguous expression of the General Assembly's intent to distinguish the law applicable to the circumstances addressed within the 'notwithstanding' clause from the law applicable to [other] circumstances[.]"); *Pleasant Hills Construction Co., Inc. v. Public Auditorium Authority*, 784 A.2d 1277, 1283 (Pa. 2001) (concluding that a "notwithstanding clause is clear, means regardless," and "explicitly preempts other Commonwealth laws").

Here, section 1525 of the School Code vests the District with the sole discretion and statutory authority to enter the Agreement with the College. Because this statutory section contains a "notwithstanding clause," the authority granted to the District in section 1525 cannot be questioned or altered in any manner via any other

conceivable law no matter how applicable that law may appear to be. Consequently, even assuming the Association had collective bargaining rights under section 701 of PERA, section 1525 of the School Code would supersede those rights.

Therefore, in the alternative, we conclude that section 703 of PERA mandates that the District's decision to enter in the Agreement is not one that can be subjected to collective bargaining. On this basis, we conclude that the District did not violate PERA, and that the PLRB erred in determining otherwise.

### The Balancing of Competing Interests—Managerial Rights Versus Bargaining Rights

Third, assuming that the District has managerial rights under section 702, and the Association possesses collective bargaining rights pursuant to section 701, the two must be compared in a qualitive manner to determine which prevails.

"Many educational policy decisions make an impact on a teacher's conditions of employment and the converse is equally true. There is no unwavering line separating the two categories." *United Teachers of Dade*, 500 So.2d at 513. "Most courts therefore have determined the issues on a case-by-case basis, but, as a starting point for their analysis, have tended to view the test of bargainability as the degree of impact on wages, hours or other conditions of employment." *Id.* As our Supreme Court stated, a court must balance "the relative weight of the impacted interest of the public employee in wages, hours, and conditions of employment against the public employer's impacted interest in basic policy matters," and if "the latter outweighs the former, such topic shall be deemed to constitute an inherent managerial prerogative and be insulated from the give-and-take of mandatory collective bargaining." *Association of Pennsylvania State College*, 226 A.3d at 1244.

21

Here, in conducting a balancing test, as we explained above, the District has a compelling and strong public interest in its educational policy, particularly with respect to creating dual education programs such as the one sanctioned in section 1525 of the School Code, which expressly authorizes the District's Agreement with the College. Importantly, that section vests "a school district" with the power to "enter into an agreement with" a college in order "to allow resident students **to attend**" the college and "receive credits toward completion of courses at the school district **and** at [the college]." *Id*. (emphasis added). Without question, this is exactly what was memorialized in the Agreement and has happened here as a matter of fact: the students of the District go to the College campus, take courses offered by the College, and obtain high school credits and credits at the College if they enroll in the College after graduating from the District.

Significantly, by utilizing the word "attend" in section 1525, our General Assembly presumed that when a school district and a postsecondary institution make an agreement pursuant to that statutory section, a student would be physically present at the postsecondary institution and would take courses that are only offered at the postsecondary institution and available for credits at that institution. Naturally, in this context, the only sustainable inference to be drawn is that the courses offered by the postsecondary institution would be instructed only by the professors, adjunct faculty, and/or staff of that postsecondary institution. Yet, the Association contends that the District's teachers possess a collective bargaining right to teach courses that are offered by and at the College and for academic credits at the College, regardless of their qualifications and even if they are not hired by or otherwise affiliated with the College.

In crediting this argument, the hearing examiner and the PLRB attempted to distinguish the PLRB's decision in *Palisades* and, in so doing, placed much

emphasis on the fact that the Agreement was not created under the rubric of Act 46, while highlighting their perception that the postsecondary institution in an Act 46 program has exclusive control over the selection of the teacher. However, as correctly noted by the PLRB, pursuant to section 1611-B(f) of the School Code, a school district can enter into an agreement under section 1525, irrespective of whether it qualifies for or obtains Act 46 grant funding. *See* 24 P.S. §16-1611-B(f); *supra* note 7. Further, and contrary to the presupposition of the PLRB, the pertinent statutory provision of Act 46 permits a postsecondary institution to "contract[] with a professional employee of a school entity for purposes of a concurrent enrollment program if the professional employee meets all [the] qualifications for an adjunct faculty member at the eligible postsecondary institution." 24 P.S. §16-1604-B(b).

Given this, it is difficult to discern any real substantial difference between *Palisades* and this case or between an Act 46 dual enrollment program or one created under section 1525 of the School Code. Both Act 46 and section 1525 envision that, in a dual enrollment program, high school students will take *college/postsecondary* courses that are taught by a faculty member or adjunct faculty member of the *college/postsecondary institution* itself. True, it is theoretically possible that the College could hire a teacher of the District to teach college courses offered by the College, assuming such a teacher possesses the necessary qualifications and/or licensure. However, as explained in *Palisades*, "the host college is under no obligation to do so and certainly has no bargain obligation with the [u]nion," *i.e.*, the Association, and, as such, "[t]he District is simply without [the] authority to give the work to the bargaining unit." *Palisades*, 37 PPER at 168, 2006 PA PED LEXIS 44, at \*\*5, 8. Moreover, in an unfair labor practice action against a public employer for unilaterally removing bargaining unit work from a union, the union has the burden of establishing

23

"that the work in question has been performed *exclusively* by the bargaining unit." *American Federation of State, County, and Municipal Employees, Council 13, AFL-CIO v. Pennsylvania Labor Relations Board*, 616 A.2d 135, 137-38 (Pa. Cmwlth. 1992). Here, akin to the situation in *Palisades*, the Association did not prove that the District's teachers, in the past, have performed, much less exclusively performed, the instruction of college courses that are offered and designed by a college and must be taken at the college for both high school and, potentially, college credits.

Nonetheless, assuming the pertinent teachers of the Association at the District had some collective bargaining rights with respect to the instruction of courses that are taught at a postsecondary institution, on the current record, it is almost impossible to gauge the impact, if any, that the Agreement could have on the terms, hours, or conditions of the Association's teachers' employment with the District. Even if the substantive content of the courses taught at the College and the District overlapped or were entirely duplicative in nature, there is no evidence that the high school classes in those subjects that are taught at the District are eligible for the receipt of college credits. Further, the teachers seemingly did not lose any hours or classes at the District as a result of the Agreement or sustain any loss of income. Presumably, and at most, the teachers underwent a slight reduction in the number of students that attended their classes because eight students were at the College for half-days during their senior year pursuant to the Agreement. But, absent concrete evidence, it is hard to see how a numerical decrease in the number of students, alone, could be directly related to the terms and conditions of employment or could, in general, be deemed a matter that is reserved for collective bargaining. Indeed, such a decrease in student attendance/enrollment could be accounted for in a variety of circumstances, implicating numerous factors that are beyond the control of the District or its school board as a

24

decision-making body, *e.g.*, students moving to another school district, decreases in citizenship in the school district's territory, an increase in drop-out rates, etc. In sum, the Association has not adduced sufficient evidence to establish—and the PLRB did not make any findings of fact that detail—the extent to which the Agreement affected the wages, hours, terms, or conditions of the employment of the Association's teachers.

Therefore, the net result of the balancing test in PERA also compels the conclusion that the District's decision to enter into the Agreement is not one that is subjected to collective bargaining but, instead, was a matter falling within the managerial prerogative of the District. On this basis, too, we conclude that the District did not violate PERA and the PLRB erred in deciding to the contrary.

## Conclusion

Accordingly, for all of the above reasons, we reverse the decision of the PLRB.

_____
PATRICIA A. McCULLOUGH, Judge

25

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Abington Heights School District,   :
                Petitioner   :
                        :   No.  404 C.D. 2021
            v.             :
                        :
Pennsylvania Labor Relations Board,  :
              Respondent  :

## ***ORDER***

AND NOW, this 10th day of February, 2022, the March 19, 2021 final order of the Pennsylvania Labor Relations Board is hereby reversed.

 

_____
PATRICIA A. McCULLOUGH, Judge